[Crim. No. 4230. In Bank.—July 8, 1939.]

THE PEOPLE, Respondent, v. GEORGE BRAUN, Appellant.

(1)

Morris Lavine for Appellant.

Earl Warren, Attorney-General, U. S. Webb, Attorney-General, and Burdette J. Daniels, Deputy Attorney-General, for Respondent.

EDMONDS, J.—The defendant was charged by the district attorney with the crime of robbery, and, also, with the prior conviction of a felony, which he admitted. Harry Groves and John Robles were named in the information as codefendants, but the charge against them was dismissed before trial. The case then proceeded with Braun as the sole defendant. Found guilty by a jury, he has appealed from the judgment rendered upon its verdicts, contending that the testimony concerning his participation in the crime is so inherently improbable as to amount to no substantial evidence; also, that the district attorney was guilty of prejudicial misconduct.

At about 4:30 on a January morning, three men, armed with deadly weapons, entered the office of the United Independent Dairies in the city of Los Angeles and held up the three employees then on duty, obtaining a small amount of money and some personal property. Kenneth Weston, one of the victims of the crime, testified that he was sitting in the office of the dairy company dozing, with his head down on the desk before him, when a man, later identified as Harry Groves, hit him on the head saying, "This is a stick-up". Groves, who carried a pistol, told him to lie down on the floor and then jerked out the cords connecting the telephone and desk lamp. At this point another man came in the door, carrying a rifle. Weston was not then prone on the floor but on his hands and knees facing the door. He observed that this second man, whom he identified as the defendant, had on a tweed overcoat, a dark hat and a grayish muffler, the muffler covering the lower part of his face, leaving the portion from his upper lip to his eyebrows exposed. Gray hair above his temples could also be seen.

This witness also testified that the defendant came over and stood about three feet from him while Groves and the third robber, later identified as John Robles, went into the back room and brought the two other employees into the office, where they were forced to lie on the floor. The three gunmen were there for about 15 minutes, during which time they robbed the three employees and made Weston get up several times to try to open the company safe. Weston testified that on these occasions he had a better opportunity to look at the defendant, but that Braun did not say anything which he heard.

Weston's first identification of the defendant was made some time after the crime when, at the police station, he picked out his picture from among those of 30 or 40 persons who were then under suspicion. At the trial he was very positive that Braun was the man with the rifle. When asked whether on the night of the holdup he noticed anything in particular about the defendant which made him positive of his identity he replied: "Yes, his size and his gray hair around the temples and at the time . . . well, after the holdup, I kept thinking that there was something that I should remember about him. I couldn't just think what it was though, and in the meantime the deputy sheriff had been showing me numerous pictures of suspects, and as soon as they showed me the pictures, why I picked it out right away because he had a scar on his nose, and I felt sure that that was what I should have remembered about it."

Groves and Robles, who admitted their complicity in the crime, were also identified by Weston, but at the preliminary hearing he felt least positive that Braun was one of the three who had held him up. After the crime, the record shows, Weston told the investigating officers that one of the robbers, wearing a tweed coat, dark hat and gray scarf, was a dark complexioned man—"possibly a Filipino, age about 40 years, and weight 155 pounds, five foot eight" or possibly taller. It does not appear that he mentioned a scar on any of the three men. At that time he was not certain about the description but stated that he could positively identify the men if he saw them.

The two other employees of the dairy company were also called as witnesses at the trial and at that time each was fairly sure that Braun was a participant in the crime. However, at the preliminary hearing one of these witnesses was not able to identify him "beyond a reasonable doubt"; the other "couldn't say for sure" whether he saw either Braun, Robles or Groves at the time of the holdup.

Groves and Robles were both called as witnesses in behalf of the defendant. Groves testified that he, Robles, and a Spaniard whom he referred to as "Pancho" committed the robbery in question; that he did not even know Braun at that time and did not make his acquaintance until a month and a half after the robbery. Robles also testified that he did not meet Braun until about the same time.

The defendant also took the witness stand. He was then a man about 46 years of age, over six feet tall, weighing about 190 pounds and not having a dark complexion. He denied any knowledge of or complicity in the robbery. He testified that he spent the evening of January 30th with a Mrs. Gerber. She did not appear at the trial, but as a witness upon defendant's motion for a new trial she fully corroborated the defendant's alibi.

It is a familiar rule that in reviewing the correctness of factual determinations, the function of an appellate court is limited to the question whether there is any substantial evidence in the record to support the judgment. To entitle a reviewing court to set aside a jury's finding of guilt, the evidence of identity must be so weak as to constitute practically no evidence at all. (*People* v. *Farrington,* 213 Cal. 459 [2 Pac. (2d) 814] ; *People* v. *Friday,* 18 Cal. App. (2d) 197 [63 Pac. (2d) 303].) In a case such as the present one, where there is positive direct testimony that the defendant was one of the perpetrators of the crime, it is incumbent upon him to show that the testimony is inherently unbelievable in order to prevail. ''A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do.'' (*People* v. *Haydon,* 18 Cal. App. 543, 553 [123 Pac. 1102].)

It must be conceded that the evidence tending to connect this defendant with the crime is not entirely convincing. Certainly the victims had only a very limited opportunity to observe their assailants. Moreover, the statements and testimony of each of them present substantial inconsistencies which are difficult to reconcile. On the other hand, these witnesses were presumably disinterested and had no reason to fabricate testimony in order to obtain the conviction of the defendant. The jury was not obliged to believe the testimony of Robles, Groves, and the defendant, each of whom at the time of the trial had been previously convicted of a felony. Considering all of the evidence, it cannot be said, as a matter of law, that the testimony of the three employees of the dairy company was so improbable as to be unworthy of all belief.

 Upon the point that the district attorney was guilty of prejudicial misconduct during the trial of the case, the record discloses that he asked the defendant: "Isn't it a fact, Mr. Braun, that you have been convicted of the crime of murder, arising out of a robbery at the Bee Hive Cafe?" Upon objection this question was reframed as follows: "Isn't it a fact that in the last part of July of this year you were convicted of the crime of murder?" The defendant replied, "I will not know until I hear from my appeal". He later admitted, in response to other questions, that he had been convicted of the crime of murder in the first degree and, also, of the crime of attempted murder.

The defendant points out that his conviction in the murder case has since been reversed upon appeal (*People* v. *Braun*, 31 Cal. App. (2d) 593 [88 Pac. (2d) 728]), and claims that the district attorney's reference to this conviction was not a proper impeachment question because the appeal was pending at that time. However, it has been held that a witness, for the purpose of impeachment, may properly be asked upon cross-examination whether he has been convicted of a felony, even though an appeal from the judgment of conviction is then pending and undecided. (*People* v. *Rogers*, 112 Cal. App. 615, 620 [297 Pac. 924].) There was, therefore, no error in allowing the fact of these convictions to be presented to the jury.

 But the defendant also properly complains that one of the questions asked him included the details of the crime for which he suffered a previous conviction. This inquiry went beyond that allowed by law, for a cross-examiner's question must be limited to the fact of conviction and the nature of the crime; he may not go into the details or circumstances surrounding the crime. (*People* v. *David*, 12 Cal. (2d) 639 [86 Pac. (2d) 811]; *People* v. *Chin Hane*, 108 Cal. 597 [41 Pac. 697]; *People* v. *Muchupoff*, 79 Cal. App. 306 [249 Pac. 240].) No request to admonish the jury was made by defendant's counsel and if this question were the only misconduct of the district attorney, it would not be a sufficient ground for a reversal of the judgment.

However, the defendant points out that the cumulative effect of this question should be considered in connection with other asserted misconduct of the district attorney. It appears that during the cross-examination of the defendant he was asked: "Mr. Braun you spent the day of the 31st of Janu-

ary with Mrs. Kessler, is that right?" Upon receiving an affirmative reply, the inquiry was continued with the question, "And she runs the Spanish Kitchen on East 1st Street?" "She did at one time", answered the defendant. "And that is a hang-out for ex-convicts?" asked the district attorney. An objection to this question was sustained and the court admonished the jury to disregard it.

Whether the misconduct of a prosecuting attorney has prejudiced the substantial rights of a defendant must rest largely upon the facts of each case. An appellate court may only reverse the judgment when it appears from all the facts that there has been a miscarriage of justice. (Const., sec. 4½ art. VI.) Obviously, conduct of a prosecutor which would amount to prejudicial misconduct in one case might not result in a miscarriage of justice in another case. In other words, there is no definite rule by which asserted misconduct may be measured for the purpose of determining whether it prevented the defendant from having that fair and impartial trial which the law requires for every person charged with a crime.

In the present case the defendant was convicted of a felony upon testimony concerning identification which, although measuring up to the requirement of substantial evidence leaves considerable doubt in the mind of one who reads it in connection with the defendant's positive denials, the corroboration of his alibi, and the statements of those originally charged as co-defendants with him that he was not present. For many persons, positive identification is difficult, even where one is observed under normal conditions. Considering the time when the robbers came to the dairy company's office, the masks which they wore, the positions the employees were forced to take, and the excitement of the moment, it would be surprising if any one of the victims could describe the robbers with accuracy. Unquestionably the witnesses testified to their best recollection, and under ordinary circumstances a verdict resting upon their testimony and the other facts in the case should be upheld as supported by the evidence.

But to what extent, if at all, the jury was influenced by the questions of the district attorney which the defendant asserts amounted to misconduct no one may say with certainty. The testimony of the prosecution's witnesses does not point unerringly to the defendant's guilt, and when

weighed by the jury as against that offered by the defendant, the scales of justice would undoubtedly be somewhat evenly balanced in the mind of the ordinary person. Under such circumstances, the information that the crime of which the defendant had been previously convicted was murder arising out of a cafe robbery and the inference that he associated with ex-convicts undoubtedly weighed heavily against him and may have been the deciding factors which brought about his conviction. The misconduct of the district attorney, therefore, resulted in a miscarriage of justice entitling the defendant to a new trial. (*People* v. *MacPhee*, 26 Cal. App. 218 [146 Pac. 522]; *People* v. *Podwys*, 6 Cal. App. (2d) 71 [44 Pac. (2d) 377].)

The order denying a new trial and the judgment are, and each of them is, reversed.

Curtis, J., Shenk, J., and Houser, J., concurred.