[Crim. No. 4349. In Bank.—July 23, 1941.]

THE PEOPLE, Respondent, v. ORVILLE M. HEADLEE, Appellant.

Mark F. Jones and W. L. Engelhardt for Appellant.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

THE COURT.—In an information filed by the District Attorney of Los Angeles County, the defendant was charged with the commission of five distinct offenses. A jury trial resulted in his conviction and sentence on the three counts of kidnaping for purpose of robbery, robbery, and rape, the sentences thereon to run concurrently. The defendant was acquitted on two other counts charging another rape and grand theft. Upon this appeal he challenges the sufficiency of the evidence to support the three verdicts of conviction and the judgments based thereon.

It is not the function of appellate courts to weigh evidence. (*People* v. *Tom Woo*, 181 Cal. 315 [184 Pac. 389] ; *People* v. *Tedesco*, 1 Cal. (2d) 211 [34 Pac. (2d) 467] ; *People* v. *Perkins*, 8 Cal. (2d) 502 [66 Pac. (2d) 631].) Where, however, the evidence relied upon by the prosecution is so improbable as to be incredible, and amounts to no evidence, a question of law is presented which authorizes an appellate court to set aside a conviction. (*People* v. *Dorland*, 2 Cal. (2d) 235 [40 Pac. (2d) 474].) Under such circumstances an appellate court will assume that the verdict was the result of passion and prejudice. (*People* v. *Niino*, 183 Cal. 126 [190 Pac. 626].) To be improbable on its face the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed. The improbability must be apparent; evidence which is unusual or inconsistent is not necessarily improbable.

(*People* v. *Braun,* 14 Cal. (2d) 1 [92 Pac. (2d) 402] ; *People* v. *Moreno,* 26 Cal. App. (2d) 334 [79 Pac. (2d) 390].) In this case the inherent improbability of the testimony of the principal witnesses is readily apparent from an examination of the record. The five charges contained in the information arose out of a sequence of alleged acts purportedly occurring within a few hours. In considering the evidence it is relevant to consider the evidence addressed to the two charges of which the defendant stands acquitted, for it contributes to the improbability of the evidence addressed to the three charges of which the defendant stands convicted.

 Miss Helen Cash, 22 years of age, testified as follows : On the evening of April .14, 1940, she left a moving picture theatre in Compton with her friend Mrs. Goodwin at approximately 10 :50 p. m., and hailed a taxicab. She had met the driver, John Fontana, on a previous occasion, and she and Mrs. Goodwin sat in the front seat with Fontana. Shortly after they entered the cab Fontana made a stop and received a call to go to the McDonald party house, a highway tavern. They arrived there at about 11 :00 p. m. Fontana went to the tavern and came back to the cab with the defendant who said he wanted to go to Southgate. The defendant sat in the back seat and during the ride ''pulled guns'' on them. At the time she saw only one gun which the defendant held in his right hand ''on Mr. Fontana's neck'' while telling him to keep going and threatening them if they attempted to attract attention. Later, the defendant asked Fontana ''what girl belonged to him,'' and when Mrs. Goodwin replied ''I do'' the defendant put the gun on the shoulder of the witness and told her to get in the back seat with him. She looked at Fontana who suggested compliance, whereupon she climbed into the back seat with the defendant. The defendant then placed his right arm around her with the gun against her right temple, began to fondle her person and then, as she related, ''he laid me down on the seat and attacked me.'' Nothing was said by anyone, and during the act of intercourse she did not see the gun. Subsequently, the defendant told Fontana to drive into an auto-court, which in time he did. Thereupon the defendant put the gun in Fontana's ribs, told him to get out of the cab and directed the witness to get back into the front seat with Mrs. Goodwin while he and Fontana proceeded to the office of the auto-court.

At this point, in answering a question of the district attorney, the witness volunteered the information that, when leaving with the defendant for the auto-court office, "Mr. Fontana left the car running so if we wanted to we could drive it off." Immediately the district attorney said, "I ask that be stricken out," to which the trial court replied "Yes." How much of the answer, of which the foregoing was only a part, was requested by the district attorney to be stricken is uncertain.

The witness then went on to testify: As the two men went into the office of the auto-court she did not see the defendant do anything to conceal the gun he held on Fontana's ribs. The two men returned shortly, the defendant getting into the back seat. Fontana drove the cab to cabins numbered 11 and 12 and put the cab in the shelter provided therefor. The witness did not see the gun during these proceedings. The defendant asked for the key to the cab, which Fontana gave him. He then displayed two guns and threatened them if they "tried to do anything." Mrs. Goodwin and Fontana went into cabin 12 and the witness and the defendant into cabin 11. She closed the door behind her, and it was not thereafter locked. She inquired "where do you turn the light on here," whereupon the defendant lighted the cabin. The defendant placed one gun on the dresser and pointed the other at her and told her to undress. She undressed and got into bed. The defendant undressed, placed a pistol under the pillow and got into bed. In response to a query as to what then happened, the witness replied, "Well, we had sexual intercourse again." She did not remember the defendant saying anything immediately preceding and during this time. The defendant then told her to do a revolting act, which she did, assertedly in fear of bodily harm from the gun. She submitted each time, however, without any plea, remonstrance or struggle. Shortly after, when officers knocked at the door she went to the bathroom, dressed, and then told the officers what the defendant had done.

On cross-examination the witness again related substantially the same story with the addition of the following: The defendant and Fontana were in the office of the auto-court for about five minutes. During that time she did not always watch the defendant but talked to Mrs. Goodwin. The latter suggested getting out and running, but the witness rejected

the idea because the defendant would shoot them or Fontana. During the episode in the cab Mrs. Goodwin looked around to the back seat but none of the three protested the defendant's conduct. The witness was assertedly in fear because of the gun and defendant's earlier threats. Just before entering the cabin the defendant requested Fontana to awaken him in the morning and said, "I will buy breakfast because I have five fifty-dollar bills in my pocket." Before entering the cabin she did not plead or remonstrate with the defendant. When the defendant told her to undress she did not protest; instead, she "never said a thing."

Mike Gasparich, a garage owner, testified that the defendant had worked for him. He identified the two guns possessed by the defendant as having been found in the glove compartment of a wrecked car which had been towed into his garage. The guns and other things, he testified, had been removed with the defendant's assistance from the car and placed in a box in the garage office.

Robert Thomas, a bartender at the McDonald party house, testified that the defendant appeared there about 9:30 p. m., and ordered a drink; that he was showing off two pistols; that the witness asked for them and "put them behind the bar"; and that he returned them to the defendant before he left at about 11:00 p. m. in a cab which had been called at his request.

John Fontana, the cab driver, related a series of events substantially similar to Miss Cash's testimony. He testified as follows: As he drove along with the two women in the front seat the defendant in the back seat said "get going," and he felt "cold steel" against his neck. He did not see what later occurred in the back seat between the defendant and Miss Cash, but in the rear-view mirror he could see the defendant who kept his face toward him most of the time. When he entered the office of the auto-court he left the motor running, the lights on, and the key in the car. The defendant kept the gun against his ribs at all times, and there was light enough at one time for it to be seen by the proprietor. The defendant started paying the proprietor for the two cabins rented and then said to the witness, "You pay the balance whatever it is." He paid the balance ($1.50) at the defendant's command. (This transaction constitutes the basis of the robbery conviction.) After the witness had signed the

register the proprietor asked for the license number of the car, and he went to the door of the office to look at the license with the defendant at his back at all times. He and Mrs. Goodwin entered cabin 12 pursuant to the defendant's directions and he later got out through the bathroom window and summoned police officers.

On cross-examination the witness testified that when he and Mrs. Goodwin entered cabin 12 the defendant told them to lock themselves in, but that the defendant did not ask for the key. He stated that at the time of trial he was out of the taxicab business, the adverse publicity resulting therefrom causing women to refuse to ride with him.

Mrs. Goodwin told substantially the same story as Miss Cash and Fontana. It is relevant here only to note that she testified that she saw the defendant on top of Miss Cash in the back seat of the car with a gun at her head, and that she (the witness) thereupon "jabbed" Fontana in the ribs and he looked at her and smiled.

James Roberts, proprietor of the auto-court where the quartet stopped, testified as follows. The defendant and Fontana came to his office about 12:15 a. m., and said they wanted two cabins. He told them they would have to register their "wives" and the license number of their car. Fontana "went out far enough so he could see it" and "then he came back and put the license down." Upon inquiry Fontana was informed that the charge for the cabins would be $4.00, whereupon the defendant, after searching his pockets, found some small change which he placed on the counter with the request that it be counted. It added up to $2.50, whereupon the defendant asked Fontana if he had any money. Fontana then turned over $1.50 which made up the difference. On cross-examination the witness testified that when Fontana left the office to get the car license number "he went out past this Mr. Headlee [defendant] and went out on the step and looked down . . . and came back and put it down." During all of this time the defendant was doing nothing other than leaning against the office desk. The car was so parked that the witness "could not see it from the office."

The defendant, who is 25 years of age, took the stand in his own defense and testified as follows: He and the proprietor of the garage where he worked found two guns in a

wrecked car which had been brought into the garage. On the afternoon of April 14, 1940, he took the guns with him to deliver them to the sheriff's office at Firestone Station and on the way stopped at a tavern. He later proceeded with a friend in the latter's car to the McDonald party house which his friend subsequently left. The witness then took the guns from the car and openly carried them into the McDonald party house where he showed them to a person sitting at the bar. The bartender placed them under the bar to obviate any fear among other patrons. The witness later had a cab called and took back the guns as he left. As he walked to the cab with Fontana the latter said, "I have a couple of hot shot girls out here, do you mind if they go along . . . they are hustlers." The defendant said it was all right with him. As he walked to the cab he had one gun in his pocket and the other in its holster in his hand, and as he entered the cab he placed the latter weapon on the seat beside him. As they were riding he asked Fontana which girl was with him, to which Mrs. Goodwin replied, "I am." He then asked Miss Cash if she would join him in the back seat, which she did by climbing over the front seat. He "loved her up a little" and she offered no objection. After a while Miss Cash asked him if he wanted to go to a cabin. He assented. Fontana said he knew of an auto-court and drove there. The witness and Fontana entered the office and the latter signed the register. When informed that the cabins would cost $4.00 the defendant went through his pockets and brought out $2.50 which he placed on the counter and then asked Fontana if he had any money. Fontana replied affirmatively and brought out $1.50, which he pushed over the desk to the proprietor. The quartet then proceeded to the cabins. While opening the cabin doors he asked Fontana not to run off and leave him out there. Fontana promised not to and gave the defendant the key to the car. The witness and Miss Cash entered one of the cabins and he placed one gun in a dresser drawer and, as was his custom at his garage headquarters, placed one gun under a pillow. Miss Cash said she would have to have her money first. Upon objection that she asked too much money she replied, "Well, Johnny [Fontana] will have to have his part of it." They undressed and engaged in an act of intercourse and other conduct with the consent and solicitation of Miss Cash. When the officers

knocked he told them to come in, that the door was open. He denied having intercourse with Miss Cash in the cab and also denied ever threatening any of the three or making them do anything against their will.

From the foregoing testimony of the principal prosecution witnesses, the conclusion that those witnesses did not consent, either actively or passively, to the occurrences of that evening is incredible. None of them offered any objection when the defendant allegedly engaged in an act of sexual intercourse with Miss Cash in the cab against her will. Nor did they in any manner attempt to prevent the defendant from carrying out his act. On the contrary, Mrs. Goodwin testified that when she "jabbed" Fontana in the ribs during this episode he looked at her and smiled. These are not the normal actions of persons outraged by conduct such as that charged to the defendant. They claim to have been in fear of the defendant's guns, yet Miss Cash testified that the defendant kept the gun against her head and person during the act of intercourse, while according to Fontana's story the gun was pressed against his neck at all times.

It is significant that Fontana and the defendant left the cab for five minutes or more to make arrangements for cabins at the auto-court office. Both Miss Cash and Fontana testified that the motor of the car was running all during this period. The proprietor of the auto-court testified that he could not see the cab from the office. Miss Cash admitted that she was not watching the men at all times when they were in the office, but, instead, was talking with Mrs. Goodwin. No effort was made by either woman to drive the car away or to leave the car and attempt an escape by foot under cover of darkness, though admittedly Mrs. Goodwin had suggested the latter course. This is not the conduct of a person who has been kidnaped or assertedly the victim of a previous attack.

The conduct of Fontana while in the office of the auto-court was not that of a person who was being kidnaped and robbed. According to his own testimony he went beyond the door of the office to ascertain the license number of his car. The proprietor of the auto-court testified that Fontana went out on the step of the office past the defendant, who at the time was merely leaning on the desk. According to his testimony, the two men were some distance apart at that

point and he observed no gun being held by the defendant. The money transaction in the office discloses only a financial inability on the defendant's part to defray the entire cost of the cabin rentals, and a request that Fontana contribute thereto.

The improbability of the prosecution testimony that defendant demanded the key to the car to prevent the escape of his asserted victims, and the reasonableness of defendant's explanation that the key was voluntarily delivered to him as a gesture of good faith in response to his request that the parties not leave him at the auto-court, are attested by the fact that defendant concededly permitted Fontana and Mrs. Goodwin to enter a separate cabin, they retaining the key therefor, thus freeing themselves from the asserted coercion.

The conduct of Miss Cash in the cabin does not reveal any opposition on her part to the proceedings. She made no objection to entering the cabin with the defendant. Upon entering the cabin she closed the door behind her and inquired where the light could be turned on. This action indicates that the defendant must have preceded her into the cabin and thus did not force her to enter. The asserted attack in the cabin admittedly took place without any plea or word of protest or objection from her. Concededly, she exerted no physical effort to prevent the alleged assault. Certain parts of her testimony indicate that, although unmarried, she had previously engaged in acts of sexual intercourse. In the light of all that had gone before, with the opportunities of escape above mentioned, we think it highly improbable that the total absence of objection and resistance was prompted by the defendant's asserted earlier threats.

The jury acquitted the defendant of the charge of rape in the taxicab, yet Miss Cash testified unequivocally to the occurrence of an act of sexual intercourse between her and the defendant at that time. The jury therefore either entirely disbelieved the prosecution testimony and concluded that the act did not occur, or it concluded that the act was performed with the consent of Miss Cash. If the jury entirely disbelieved the witnesses as to the occurrence of the first act of intercourse, it could not reasonably believe the testimony as to the second act of intercourse, and its verdict to the contrary must have been the result of passion and prejudice. The first act was assertedly committed in the

presence of all three witnesses; the second act supposedly occurred when the defendant and Miss Cash were alone in the cabin and Miss Cash was the only prosecution witness to testify to its occurrence. Her testimony as to the occurrence of the first act was just as positive as her testimony as to the occurrence of the second. If the jury concluded that the first act of intercourse actually took place but that it occurred with the consent of Miss Cash, it is highly improbable that she did not consent to the second act, particularly in view of the fact that she offered no objection or resistance to it.

The asserted silence or admissions of the defendant in response to questions by the officers as to his having had intercourse with Miss Cash do not require a different conclusion. Read in its entirety the evidence merely shows an admission by the defendant of sexual intercourse with Miss Cash, with her consent. The testimony of the deputy sheriff Welever as to the girl's charge made in the cabin and the defendant's response thereto, when read in connection with the girl's testimony at the trial describing the circumstances surrounding commission of the alleged attacks, definitely indicates that she was referring to the asserted rape in the cab, of which the defendant stands acquitted. It is significant that there is no reference in the testimony of the officers to questions addressed by them to the defendant with respect to the asserted charges of kidnaping for the purpose of robbery, or robbery.

The judgments and order denying a new trial are, and each is, hereby reversed.