[Crim. No. 2202.   First Dist., Div. One.   June 26, 1942.]

THE PEOPLE, Respondent, v. FESTUS L. COLEMAN, Appellant.

Andersen & Resner for Appellant.

Albert M. Herzig, Thelma S. Herzig, George Olshausen and Harold M. Sawyer, as Amici Curiae, on behalf of Appellant.

Earl Warren, Attorney General, and David K. Lener and Chas. W. Johnson, Deputies Attorney General, for Respondent.

WARD, J.—The defendant, Festus L. Coleman, was found guilty by a jury in the Superior Court in and for the City and County of San Francisco of the following crimes: sex perversion (Pen. Code, § 288a), rape, and first degree robbery;

and he has appealed from the judgments of conviction and the orders denying his motions for new trial. The grounds urged for reversal are insufficiency of the evidence to sustain the convictions; that the trial court and the district attorney committed misconduct prejudicial to defendant's rights, and failure to instruct the jury on attempted rape.

The evidence presented shows that the sex crimes were committed on a high school student (hereinafter referred to as Miss C) and that the victim of the robbery was a young army lieutenant (hereinafter referred to as Lieutenant A), attached to the United States Air Corps and stationed at Hamilton Field. It was mainly on their testimony defendant was convicted. Miss C's home was in central California. She came to San Francisco with a girl friend and the latter's parents to spend the Easter vacation at the home of the girl's aunt. She had become acquainted with Lieutenant A some time previously while he was training at the army air field near her home. The crimes were committed on Friday night, April 11, 1941, between 11:30 and 12 o'clock near the 43rd Avenue-Fulton Street entrance to Golden Gate Park, a few blocks distant from the home where Miss C was visiting. The defendant, who is a negro, testifying in his own behalf, admitted being at the scene of the crimes at the time they were alleged to have been committed and that he had engaged in a fight with Lieutenant A, but he denied having molested the girl in any manner or having attempted to rob Lieutenant A.

On this appeal one of the points urged against the sufficiency of the evidence is that the testimony given by the prosecution's witnesses concerning the commission of the crimes is inherently improbable and therefore that it should be disbelieved. It is not the province of an appellate court, however, to retry a case and to draw inferences from the facts proved. That is the function of the jury. The province of the appellate court is to decide only whether upon the face of the evidence it can be held that sufficient facts would not have been found to warrant the inference of guilt. To warrant a reversal on the ground of insufficiency of the evidence it must be found that upon no hypothesis is there sufficient evidence to support the conclusion reached by the jury. (*People* v. *Kabakoff*, 45 Cal. App. (2d) 170 [113 P. (2d) 760].) In other words, unless the appellate court can say that the testimony is so inherently improbable as to leave the

court no recourse without self-stultification except to reverse the judgment, the reviewing court should not interfere with the verdict and the judgment of the trial court on that ground. (*People* v. *Moreno,* 26 Cal. App. (2d) 334 [79 P. (2d) 390]; *People* v. *Antunez,* 28 Cal. App. 740 [153 Pac. 963]; *People* v. *Becker,* 140 Cal. App. 162 [35 P. (2d) 196].) Furthermore, in considering the question of the sufficiency of the evidence, all intendments favor upholding the judgment and the action of the trial court, and the evidence is to be viewed in the light most favorable to the prosecution. (*People* v. *Dukes,* 90 Cal. App. 657 [266 Pac. 558].) ▮ The record in the present case discloses an abundance of evidence to sustain the jury's finding upon the question of defendant's guilt. The following are among the facts established thereby: Earlier on the evening of the commission of the crimes Lieutenant A and another young army lieutenant, stationed also at Hamilton Field (hereinafter referred to as Lieutenant B), called at the home where Miss C was visiting, to spend the evening with her and her girl companion, and later all drove down to the ocean beach nearby and spent some time patronizing the amusement enterprises. While riding in a boat in the ''chute the chutes'' concession Lieutenant B and his girl companion were splashed with water, so the party returned to the home of the girls to change and dry their clothes, after which they drove back to the amusement center at the beach, remained there for some time and then started to drive back through the park. It was a warm, bright moonlight night, and when they reached a point near the 43rd Avenue-Fulton Street entrance they stopped, listened to the radio for a while, and then Lieutenant A and Miss C said they wanted to talk alone; they took a robe, walked about a hundred feet from the roadway and sat down. They had been there but a few minutes when they heard and saw a man (the defendant) prowling about the shrubs close to them. Becoming alarmed, they got up at once, intending to return to the automobile, but as they arose the defendant suddenly emerged through the shrubs, wearing a paper mask, with his hat pulled down over his eyes, and carrying a pistol. Lieutenant A said to him: ''What can I do for you, fellow?'' and the defendant, pointing the pistol at Lieutenant A said, ''This is a stick-up. Don't say a word.'' ''I don't want any funny business or I'll blow you to pieces.'' He then ordered Lieutenant A to turn around, and placing the muzzle of the pistol at his back said, ''I want your money. Where is it?''

The lieutenant replied that it was in his back pocket. There-upon the defendant removed the lieutenant's wallet from his pocket and also some loose change and a bunch of keys from another pocket. He offered the keys to the girl, saying, "Here, sister, you can have the keys as a souvenir of your boy friend"; but when she started to take the keys he said, "No, I think I'll keep them." He then ordered the lieutenant to walk about five feet into the bushes, and to kneel down and keep facing the bushes, saying that "there were some other fellows waiting around the bushes for him and that they would get him if either of us tried to make a move." He then ordered the girl to take off her pants and lie down. Lieuten-ant A spoke up, saying: "What are you going to do?," and the defendant replied that "he was going to French my girl friend." The lieutenant asked him "what it meant," and he replied, "I am going to kiss her between the legs." The lieu-tenant pleaded with him to let the girl alone, and he replied that "that was all he was going to do," and defendant told the girl not to be afraid. After he had forced the girl to lie down he told her to put her blouse over her head. She testi-fied that he then put his mouth against her private parts and kept his mouth there for five or ten minutes, following which he began raping her. Before defendant started raping the girl Lieutenant A several times attempted to turn around and say something, but each time defendant threatened him with the pistol and warned him to keep facing the bushes. But when defendant began raping the girl she cried out and the lieutenant immediately sprang upon the defendant as he lay on top of the girl, and a desperate struggle ensued, during which the lieutenant's hand was badly cut in several places, partially disabling him. As the struggle began the mask fell from the defendant's face, and the girl and her companion then observed for the first time that he was a negro. Being freed from the defendant the girl ran screaming for Lieuten-ant B and the two young men finally subdued the defendant and started to walk him to the police station; but after pro-ceeding a short distance defendant put up a fight in an at-tempt to escape, whereupon Lieutenant B returned for the automobile, and placing appellant between them in the front seat and the two girls in the back seat they drove defendant to the police station and turned him over to the police. There-upon a police officer accompanied the two young men back to the scene of the crimes and there they found defendant's hat,

the pistol, the paper mask, and Lieutenant A's wallet; also a piece of glass smeared with moist blood, with which Lieutenant A's hand evidently had been cut. Several times during the struggle defendant warned that he had a knife, but no knife was found. Upon finding the articles mentioned the police returned to the police station and about 2:30 a. m. that morning the defendant was questioned concerning the crimes of which he was accused and he did not deny having committed them. Two police officers so testified. His response was that he did not remember—that he had been drinking. The conversation had with him at that time, as repeated by Inspector McMahon in his testimony was as follows: "I asked him—that was a preliminary question—I asked him when he was brought in to identify his hat, which had been brought in separately. It wasn't on the defendant. And he identified it as his hat. I asked him what he had been doing out there, and he told me that he had been out there walking through the park. And I asked him what his reason for walking through the park was. And he said that he had no particular reason. I asked him how it was that he happened to hold up this soldier and had raped this girl and committed the other acts that have been testified to here. And he said 'If I done anything like that, I don't remember, I must have been drunk.' I asked him 'If you don't remember holding up this man, what were you doing out there with a gun?' And he said 'I just carried that gun, I bought it Wednesday night.' And I said 'Where?' He said 'At Woolworth's on Fillmore street.' I asked him what his reason was for packing it out there. And he stated he could give no reason for having it there. I asked him why he bought the gun, and he said he bought the gun for his babies, that they usually celebrated the Easter holidays on a Saturday, and he was going to give the gun to his babies." It was ascertained afterwards that his two children were aged respectively about eight months and a year and a half. The defendant refused to give a written statement.

At the trial, however, defendant denied ownership or any knowledge of the pistol, and denied having made the above statements to the police. He claimed that the first time he ever saw the pistol was at his hearing before the municipal court; furthermore, as stated, he denied having committed any of the criminal acts about which the girl and Lieutenant A had testified. His version in substance was as follows: He

stated that he lived on Webster Street and for about two years had worked on WPA jobs as tree topper in the Presidio. On the day in question he quit work at 4 o'clock in the afternoon, went home, got $10 and started drinking. After visiting several drinking places around Fillmore Street he bought a half pint of liquor and went to the Uptown Theater on the corner of Sutter and Steiner Streets; and after the show he bought and drank another half pint of liquor. He then went on to say that he was "feeling kind of bad" and took a street car to the beach; that he walked around for awhile and then sat down at a place near the tunnel; that after smoking a few cigarettes he decided to take a walk through the tunnel. He was wearing two pairs of pants, laced boots and rubbers. Continuing his testimony, he stated that after going through the tunnel he proceeded along a bridle trail and across a football field, then decided to walk "up the trail to go over to 43rd, to walk over to Geary Street and take a car"; that while walking along that trail he ran across Lieutenant A and Miss C engaged in an act of sexual intercourse; that Lieutenant A jumped up, began berating him and attempted to strike him; that he knocked the officer down several times, whereupon the officer summoned Lieutenant B, and that after the two had given him a severe beating, they took him to the police station.

On cross-examination he was asked when for the first time he ever told this story about having found this couple in a compromising position and he answered "In this court. . . . To-day," and the cross-examination on that point continued as follows: "Q. You never told anyone before? A. No. Q. Never? A. No. Q. You didn't tell your attorney? A. Anymore than my attorney. Q. Then you did tell somebody before to-day? A. Previous to that. Q. When? A. When he came up to see me. Q. When? A. I don't remember the date, when he came up to see me, I told him then. Q. When? A. I don't remember the date. Q. You have no idea? A. When he came to see me. Q. A week ago or a month ago or what? A. I imagine it was a couple of weeks ago. Q. Well, did you talk to Inspector McMahon on that following Saturday and tell him about it? A. I didn't talk to him." Furthermore, in contradiction of other portions of his story, Inspector McMahon testified that there were no trails or paths of any kind within a radius of 100 feet or more of the spot where the defendant claimed he came upon the couple; and testimony

was given that on the night in question there was no odor of "alcohol or anything like that" on his breath. From the foregoing narration it will be seen that the record contains an overwhelming amount of substantial evidence establishing defendant's guilt.

The defendant contends, however, that in any event none of the particular acts he is accused of having committed upon the person of the girl constituted rape or the crime of sex perversion as denounced by section 288a of the Penal Code. There is no merit in the contention.

As to the crime of rape the girl testified that she felt his private parts in her private parts. The crime was complete, therefore, the moment penetration occurred. (22 Cal. Jur. 361, § 6.) ██ ██ As to the element of violence, the girl testified in effect that the reason she did not offer greater resistance was that she believed he had a "real gun"; that she was afraid, and fearful of being shot, which was sufficient to establish the element of violence (*People* v. *Bouquet,* 30 Cal. App. (2d) 264 [86 P. (2d) 145]); and in view of the positive denial of defendant of any assault or attempted rape, the failure to instruct the jury on attempted rape, a lesser offense, in the absence of a request by the defendant for such an instruction, was not error. (*People* v. *Louviere,* 34 Cal. App. (2d) 62 [93 P. (2d) 179]; *People* v. *Welsh,* 7 Cal. (2d) 209 [60 P. (2d) 124]; *People* v. *Dozier,* 35 Cal. App. (2d) 49 [94 P. (2d) 598].)

██ Regarding the crime of sex perversion, the provisions of said section 288a declare that ". . . the act of copulating the mouth of one person with the sexual organ of another . . ." constitutes the crime. In thus defining the crime it was obviously the intention of the Legislature to include therein loathsome sexual acts of the kind here committed. Defendant argues, and in the brief of amicus curiae (which was filed herein after oral argument and subsequent to the original submission of the cause) it is contended, that in view of the decision rendered in *People* v. *Angier,* 44 Cal. App. (2d) 417 [112 P. (2d) 659], the crime of sex perversion as defined by said section 288a was not here committed. A mere glance at the facts of that case clearly shows, however, that there is no comparison whatever between the single act there committed on the seven-year-old girl, and the continuous act committed on the young lady here assaulted, for while the defendant in this case said he was merely going "to kiss" the girl between

the legs he went far beyond doing so. As stated, he placed his mouth against her sexual organ and kept it there for five or ten minutes. Therefore the jury was fully justified in finding therefrom, as a fact, that the crime of sex perversion as defined by the code section had been committed. Furthermore one of the two determining factors in the Angier case upon which the reversal therein was based was the absence of evidence to establish that the defendant's mouth touched "the sexual organ" of the child, while here there is positive evidence that such was the case.

Defendant seems to contend also that the crime of sex perversion as denounced by said section 288a cannot be committed by two persons of the opposite sex. The following decisions answer this contention: *People* v. *Briley,* 9 Cal. App. (2d) 84 [48 P. (2d) 734]; *People* v. *Roveano,* 130 Cal. App. 222 [19 P. (2d) 506]; *People* v. *Miller,* 27 Cal. App. (2d) 722 [81 P. (2d) 567]; *People* v. *Avanzi,* 25 Cal. App. (2d) 301 [77 P. (2d) 237]; *People* v. *Ralls,* 21 Cal. App. (2d) 674 [70 P. (2d) 265]. These cases do not relate the details in the manner outlined in *People* v. *Angier, supra,* but the Angier case did not suggest that the crime could not be committed between a male and a female. The court there said, page 419: ". . . the legislature, in framing section 288a of the Penal Code, must have intended to punish only those who participate in an act whereby they are *united* or joined by the perverted act of one's holding in his mouth the sexual organ of another for the purpose of gratifying their sexual desires." Without analyzing all that was said in *People* v. *Angier, supra,* we have concluded that, assuming the correctness of the decision, the facts are so dissimilar as to be of no assistance to appellant. In *People* v. *Avanzi, supra,* page 302, the court said: "It is clear that no particular purpose, motive or intent is a necessary element of the crime described."

In a prosecution for violation of section 288a, there is no requirement that the testimony of a complaining party should be corroborated except where the complainant is an accomplice; that is, one liable for prosecution for the identical offense charged against the defendant. (Pen. Code, § 1111.) The evidence in the present case does not even suggest that the young woman was an accomplice. There is evidence to show that she submitted to defendant's acts under threats and menace; that she had reasonable cause to and did believe that

her life would be endangered if she resisted. Under such circumstances she was not a participant in the crime. (Pen. Code, § 26; *People* v. *Solano,* 48 Cal. App. (2d) 126 [119 P. (2d) 381].) There is evidence showing not only fear of the defendant, but of possible confederates, as the defendant warned, lurking in the shrubbery. Assuming the testimony of the young woman required corroboration, it appears in the testimony of Lieutenant A heretofore given.

On the charge of robbery, the facts that the perpetrator was unarmed, or, being armed, made no use of the weapon, do not necessarily establish that personal property was taken from the person of another without the use of force or fear. (Pen. Code, § 211.) The evidence in the present case is amply sufficient to uphold a conviction of robbery. Proof that a defendant was armed is required only to fix the degree of the crime. To fix it as of the first degree, it is not necessary that the weapon should be a deadly weapon, if, in fact, it is a "dangerous" weapon. (Pen. Code, § 211a.) Robbery committed with an unloaded pistol may be robbery of the first degree. The pistol need not be used or intended to be used as a firearm. If it is capable of use as a club or as an instrument to produce bodily harm it may be classified as a "dangerous" weapon. In *People* v. *Egan,* 77 Cal. App. 279, 284 [246 Pac. 337], the court said: "Appellant urges also that the evidence is insufficient to sustain a conviction of first degree robbery because it did not appear that the revolver used in the perpetration of the crime was loaded. In support of this point appellant cites the case of *People* v. *Sylva,* 143 Cal. 62 [76 Pac. 814]. That case is not in point, however, because it involved the construction of the term 'deadly weapon' as used in the code section defining the crime of assault with a deadly weapon (Pen. Code, § 245), which is a different term from the one employed in the code section defining first degree robbery. The latter section declares that 'all robbery . . , . perpetrated . . . by a person armed with a *dangerous* or deadly weapon is robbery of the first degree.' (Pen. Code, § 211a.) (Italics ours.) It is a matter of common knowledge that in committing robbery pistols are frequently used as bludgeons rather than as firearms. The fact, therefore, that a person perpetrating such crime is armed with a pistol is enough to justify the conclusion that the pistol used by him is a 'dangerous' weapon within the meaning of said section 211a of the Penal Code, even though it be not loaded." It is immaterial

whether such weapon is actually used. (*People* v. *Raleigh,* 128 Cal. App. 105 [16 P. (2d) 752] ; *People* v. *Hall,* 105 Cal. App. 359 [287 Pac. 533].)

The pistol was introduced in evidence and exhibited to the jury. The officer who found it referred to it as "a nickel plated revolver"; and in asking Lieutenant A to identify it at the trial the prosecutor's question was: "Now, I will call your attention here to what I will refer to as an automatic pistol, that is to say I believe it is referred to as a toy pistol, it is marked 'Army 45,' and I ask you if that resembles in size, shape and general appearance the gun that this man who came toward you had upon that particular night?" and the witness replied: "It does." If it was capable of being used as a deadly weapon "and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." (*People* v. *Raleigh, supra,* pp. 108-109.) Whether or not the pistol was a dangerous weapon is a question of fact to be decided exclusively by the jury. (Pen. Code, §§ 1126, 1127, 1439; *People* v. *Raleigh, supra.*) In *People* v. *Cook,* 15 Cal. (2d) 507 [102 P. (2d) 752], in discussing a certain weapon instrument "a piece of two by four about two feet long," the court at page 517, said: "Therefore, under all the facts and circumstances of the instant case the questions of the nature of the weapon and the manner of its use in their relation to the crime committed were for the determination of the jury."

▮ Appellant specifies several instances wherein he claims the trial judge questioned him to his prejudice. These instances occurred during either the direct or cross-examination of the defendant and related primarily to the latter's explanation of his admitted presence here and there in the park, wandering around for several hours preceding the occurrences herein, wearing rubbers and a pair of jeans over his trousers, when, as stated in his opening brief, after walking along the beach he decided to go home by taking "a short cut through the park to the street car." In one instance the trial judge used the word "sneaking," but upon objection struck the word from the record and reframed the question. All questions propounded were judicial in purpose (*People* v. *Patubo,* 9 Cal. (2d) 537 [71 P. (2d) 270, 113 A. L. R. 1303]) and re-

lated to matters upon which defendant had been interrogated by his counsel; they were questions that would have been proper if asked by either defendant's counsel or the district attorney. (*People* v. *Ramos*, 3 Cal. (2d) 269 [44 P. (2d) 301].) "A trial judge certainly is authorized on cross-examination of a defendant to call his attention to apparently conflicting statements which he has made so as to give him an opportunity to explain or reconcile them if possible." (*People* v. *Butterfield*, 40 Cal. App. (2d) 725, 731 [105 P. (2d) 628].)

Lieutenant B was called out of order by stipulation because he was "due to fly to-morrow." Upon completion of his testimony the court said: "Yes, he may go on his trip and good luck to you." The conduct of the court is not comparable to that related in *People* v. *Mahoney*, 201 Cal. 618 [258 Pac. 607] and other cases cited by appellant. The conduct of the court in propounding questions or in his remark to the army officer was not prejudicial to the rights of the defendant. (*People* v. *Briley*, *supra*.) Moreover, at no time during the course of the trial did defendant assign as misconduct any question propounded or statement made by the court.

■ The second specification of misconduct is directed against the district attorney and grows out of the following incident, which took place shortly after beginning the defendant's cross-examination: "Mr. Skillin [assistant district attorney] : Q. Now, you are quite certain you didn't have on when you came home from work that afternoon, an old rusty looking pair of boots? Mr. Young: If the court please, I am going to object to the manner of examining this witness, holding a paper up in front of the jury. If he is going to do that, let's find out what the paper is. Mr. Skillin: Of course you know as well as I do I can't call his wife as a witness against him. Mr. Young: I don't know anything about that. I didn't even know you had a statement from the wife. Mr. Skillin: I have got a statement from the wife, where she said he had an old rusty pair of boots on that laced up the front, when he came home, and he took them off and put . . . Mr. Young: Just a moment. I object to that and I assign it as prejudicial misconduct on the part of the district attorney. He knows that he can't prove indirectly what he can't do directly."

It is suggested in one of the briefs that the district attorney was "waving" the paper in front of the jury. From the above quoted statement of defendant's counsel the record shows that the district attorney was "holding" the paper.

It is proper to use a statement, notes or memoranda while examining a witness and, under the circumstances of this case, the district attorney would have been justified in refusing to show or to accede to defendant's counsel's request: ". . . let's find out what the paper is." (*People* v. *Bermijo*, 2 Cal. (2d) 270 [40 P. (2d) 823]; *People* v. *Singh*, 136 Cal. App. 233 [28 P. (2d) 416].) The reply of the district attorney was invited and to that extent justifiable, but in the determination of the guilt or innocence of an accused it is not the technical privileges accorded one side or the other in the trial of the case, but rather, whether an accused has been afforded a fair trial. The statement of the district attorney related to the clothing worn by defendant at the time he returned home from work in the late afternoon preceding the evening during which the crimes were committed. It was not vital to the establishment of the guilt of the defendant to show any particular pair of shoes he wore at the time of the commission of the offenses. There is no question here of a case of mistaken identity. On the contrary, the defendant admits his presence at the scene and his meeting with Lieutenant A and the girl, Miss C. Whether he wore new or old boots is of no consequence in view of the uncontroverted testimony that he wore rubbers. There is no denial that he wore extra trousers, which would act as a protection to inner garments in passing through the shrubbery, and rubbers, which would tend to conceal his approach. It is true that defendant explained he was a "tree topper" and that the clothes were those usually worn by one of his calling, but the use of the clothing was nevertheless a settled matter. The "jeans" and the "black rubbers" were admittedly worn by defendant. Any inference that might be drawn from the fact of the appearance of a "tree topper" just before midnight in this particular spot in the park under all the circumstances of this case was a matter entirely within the province of the jury. The changing of the boots, if it did occur, would play little if any part in the determination of the guilt or innocence of the defendant. The effect of the remark of the district attorney, considered in the aspect most favorable to defendant, would simply be that defendant's wife at some time, after the occurrences of the evening in question, had stated, not under oath, that the defendant had changed his shoes in the early part of the evening. The jury was instructed: ". . . that you and you alone determine the facts of the case, and determine the facts from

the testimony of the witnesses here on the witness stand . . .''
''. . . please bear in mind that statements of counsel in this case are not evidence in the case.''

The suggestion is made by amicus curiae that the incident mentioned operated to defendant's prejudice in that the statement of defendant's wife to which the prosecutor referred was one tending to impeach the defendant's testimony. However, as pointed out in the brief filed by respondent in reply to amicus curiae, the credibility of the defendant as a witness already had been and was thereafter in a large measure impeached by much competent evidence including his own cross-examination and the testimony of at least four other witnesses on material points. Such being the case, and keeping in mind that it was quite immaterial so far as the question of defendant's guilt was concerned whether he was wearing old or new boots, there can be no force whatever in the contention that had it not been for the disclosure by the prosecutor of the contents of said paper the jury might not have found the defendant guilty.

Throughout this appeal respondent has contended that the incident above mentioned did not constitute prejudicial misconduct. At the time of oral argument in response to questions propounded to him, counsel for respondent stated in effect that although counsel for defendant had invited the prosecutor to divulge the contents of the paper he was then holding, it was improper for the prosecutor so to do because the paper was not in evidence. However, respondent has consistently maintained that the incident complained of falls far short of calling for a reversal of the judgment of conviction; and we are in complete accord with that view.

Some questions not suggested by appellant relative to other instructions is raised by amicus curiae. Ignoring the general rule that it is not within the province of those specially permitted to appear to raise new objections, in the interest of justice the instructions have been examined and it is sufficient to say that when read together they stated the law correctly and, as applied to the facts of this case, contained no statement that was legally unjust or unfair.

Appellant's contention that the evidence of the state is ''inherently improbable'' is not based upon the fact that the designated crimes could not have been committed at the time and place alleged, but that the witnesses for the People have been guilty of a complete fabrication. Appellant does not

stop at the suggestion of a "seduction," but boldly states that there was a "voluntary intercourse" between Lieutenant A and Miss C. All the evidence is directly to the contrary. Lieutenant A testified that he did not have, nor did he attempt to have, sexual intercourse with the young girl at the time in question. It was stipulated that Miss C if called would testify to the same effect. In this connection, there is, as already mentioned, testimony by the appellant that he never made such an accusation against the young couple following his arrest; that he told it for the first time "when he [his attorney] came to see me." Appellant's opinion as expressed in one of his briefs of the "usual . . . occurrence when a young army officer . . . and a comely young lady" are together in "a secluded spot. If the intercourse did not follow, that would be improbable" is a forced argument that might perhaps mislead a jury but not a reviewing court. Appellant proceeds further and argues that Lieutenant A was guilty of a statutory rape and that to protect his reputation the witnesses concocted the story related under oath. We need not return to the unsavory and nauseating story of the evening's events, but simply call attention to the articles found at the scene of the crime by the civil authorities, and the statement of the defendant on the day following the commission of the offense, when accused of the crimes: "If I done anything like that, I don't remember, I must have been drunk." (*People* v. *Russell,* 34 Cal. App. (2d) 665 [94 P. (2d) 400].) It is noteworthy that the record does not disclose that defendant ever emphatically denied the commission of these offenses until after he had talked with his attorney.

Nowhere throughout the case is there any evidence even suggesting that these young people could have been actuated by some wrongful, hidden motive in accusing a man they had never seen before, of loathsome, heinous crimes he did not commit. Certainly there was nothing to be gained by their so doing; and it is utterly unbelievable that, if the defendant were innocent, they would think of subjecting this young lady, not yet out of high school and against whose character not a word of disparaging testimony was offered, to the humiliating ordeal of a public trial as the victim of sex crimes of a perverted nature, and of perjuring themselves to obtain a conviction.

Evidence which seems unusual is not necessarily improb-

able. (*People* v. *Headlee,* 18 Cal. (2d) 266 [115 P. (2d) 427].)　In reviewing facts an appellate court is limited to the determination of the question—is there substantial evidence to support the judgment? (*People* v. *Braun,* 14 Cal. (2d) 1 [92 P. (2d) 402].) Discrepancies in testimony, if any there be, the uncertainty of witnesses in giving the result of their observations or their recollection of oral statements, and the nature and character of an exhibit introduced in evidence are questions solely for the determination of the jury. (*People* v. *Farrington,* 213 Cal. 459 [2 P. (2d) 814]; *People* v. *Mitchell,* 61 Cal. App. 569 [215 Pac. 117]; *People* v. *Collier,* 111 Cal. App. 215 [295 Pac. 898]; *People* v. *Raleigh, supra; People* v. *Cook, supra.*)

One further contention should be mentioned. Throughout the briefs the fact that appellant is a negro is stressed. In only one instance did the district attorney refer to the color of the defendant and that in reference to the exact period when it was discovered during the events of the evening that appellant was a colored man. The record does not disclose that any prejudice existed by reason of defendant's color. All citizens should be treated equally, but the briefs filed by appellant indicate a claim that by reason of his color appellant should receive more favorable consideration than should a white person. The colored race, as a body, however, seeks only a fair and impartial trial for any accused, and this was in fact accorded appellant.

The judgments and the orders denying the motions for a new trial in the three convictions are and each of them is affirmed.

Knight, J., concurred.

PETERS, P. J., Dissenting.—I dissent.

This is a case where defendant was charged and convicted, on evidence properly described in the majority opinion, as "unsavory and nauseating," of three most serious crimes. It is also a case in which the attorney general at the time of oral argument, and in a brief filed since, very properly concedes that the prosecuting attorney committed error in summarizing in the presence of the jury the contents of a statement supposedly given by defendant's wife. The attorney general argues, and the majority opinion holds, that such error was not prejudicial. With this conclusion I cannot agree.

Before directly stating my reasons for believing that the admitted error was prejudicial, a brief reference to the state of the evidence should be made. The evidence of the prosecutrix, while not as clear as might be desired, and which, in some respects, is contradictory on whether penetration occurred, is legally sufficient, in my opinion, to support the conviction of rape. I also believe that her testimony, and that of her companion, is legally sufficient to sustain the conviction of first degree robbery. The majority opinion, however, fails to properly state appellant's main contention as to this charge. He contends that the evidence shows that he was armed with a "toy pistol," and contends that such a weapon is neither "deadly" nor "dangerous" as those terms are used in section 211a of the Penal Code in defining first degree robbery. It will be noted that no description of the "toy pistol" is set forth in the majority opinion, it being there held that "whether or not the pistol was a dangerous weapon is a question of fact to be decided exclusively by the jury." That is not the law. Certainly the appellate court may, and should, in reference to that or any other implied finding of the jury, determine whether that implied finding is supported by the evidence. In the present case, no description of the "toy pistol" appears in the evidence, although the weapon was introduced into evidence. The attorney general, prior to oral argument, secured an order requiring the exhibit to be delivered to this court, and on the oral argument asked the members of this court to examine the weapon to determine whether the implied finding of the jury that it is a "dangerous" weapon is supported. My associates have refused to examine the exhibit on the ground that it was "exclusively" a jury question as to whether the instrument was dangerous, and take the position that the appellate court has no power to examine the exhibit. Thus, in this respect, my associates contend that the sufficiency of the evidence cannot be passed on by the appellate court. To state the contention is to refute it. I have examined the exhibit. It is a metal toy pistol intended to shoot caps, has bakelite hand grips, and weighs a little over one pound. It is $6\frac{1}{4}$ inches long, and from the bottom of the hand grips to the top of the barrel is $4\frac{1}{4}$ inches. The exterior dimensions of the barrel are $1\frac{3}{8}$ inches by $\frac{3}{4}$ inch. In raised letters along each side of the barrel over the trigger appears "ARMY 45." From this brief description it is apparent that the weapon in size,

weight and appearance approximates that of a real automatic pistol. If an unloaded pistol can be considered a "dangerous" weapon, because it could be used as a bludgeon, and that is the law—*People* v. *Egan,* 77 Cal. App. 279 [246 Pac. 337]; *People* v. *Shaffer,* 81 Cal. App. 752 [254 Pac. 666]; *People* v. *Freeman,* 86 Cal. App. 374 [260 Pac. 826]; *People* v. *Hall,* 87 Cal. App. 634 [262 Pac. 50]; *People* v. *Seaman,* 101 Cal. App. 302 [281 Pac. 660]; *People* v. *Raleigh,* 128 Cal. App. 105 [16 P. (2d) 752]—obviously this "toy" pistol of the same size and weight could likewise be so used. Where reasonable minds can differ on whether the instrument used is "dangerous," the question is one of fact for the jury. The jury having viewed the weapon, its determination, under these circumstances, but only under these circumstances, is conclusive.

In reference to the charge of violation of section 288a of the Penal Code, it is also my opinion that the evidence is sufficient to support the judgment of conviction, although this conclusion is clearly contrary to the law announced in *People* v. *Angier,* 44 Cal. App. (2d) 417 [112 P. (2d) 659]. The majority opinion attempts to distinguish the Angier case on its facts. Quite significantly the majority opinion is silent as to the law stated in that opinion. If section 288a requires copulation as defined in the Angier case, there is no evidence of such copulation as thus defined in the instant case. While I disagree with the holding and reasoning in the Angier case, I think, in fairness to defendant, it should be noted that the Supreme Court less than a year ago denied a hearing in that case and that the law stated in the majority opinion, and in this dissent, on this issue, is clearly contrary to the holding in the Angier case.

From the foregoing it is apparent that it is my view that the evidence is legally sufficient to sustain all three convictions, although I recognize that as to the charge involving the alleged violation of section 288a, this conclusion (as well as the identical conclusion in the majority opinion), is contrary to the holding in the Angier case, *supra*. The conclusion that the evidence is sufficient, however, does not necessarily mean that the judgments should be affirmed. It is my view that it is the function and duty of an appellate court, after having determined that the evidence is legally sufficient, to then determine two other problems—viz., was error committed, and, if so, was such error prejudicial? As to

the first of these questions—i. e., was error committed—it is conceded by the attorney general that error was committed. This concession undoubtedly is in accordance with the fact. The prosecuting attorney, while cross-examining the defendant, read from a document in his hand. When the attorney for defendant fell into the trap, and demanded to know what the document was, the prosecuting attorney stated that the document was a statement given by the wife of defendant. When the defendant's counsel stated that he did not know such a statement existed the prosecuting attorney not only declared that such a statement existed but gratuitously added that in that statement the wife had declared that defendant had come home from work and changed his clothes to those he was wearing when arrested. Although the statement was objected to and assigned as prejudicial misconduct, the court made no ruling on the objection or assignment. The majority opinion holds that such error was not prejudicial because the question of "how" the defendant was dressed was immaterial. While it is true that "how" the defendant was dressed had no relevancy on the issue of identity, inasmuch as the defendant admitted he was present at the scene of the crime, that evidence was introduced for an entirely different purpose. The prosecuting attorney was trying to show that defendant came home from work with an old pair of boots on, changed them and put on rubbers over the boots, and went out and committed these crimes. If this were true, in view of the type of clothing he was wearing when arrested, it would go far in proving that defendant had started out that evening with a deliberate and premeditated criminal purpose. The prosecuting attorney asked all the witnesses produced by him how the defendant was dressed at the time of the crime. These witnesses testified as to the wearing by defendant of boots and rubbers. On direct examination of defendant his counsel also asked questions concerning how defendant was dressed the day and night of the crime. He testified that when he came home from work that day he had on the boots that had been introduced into evidence by the prosecution and which the witnesses had identified as the boots he wore later that night when arrested. He also testified that he worked as a tree topper on the day in question and while doing such work was dressed as he was when arrested. On cross-examination the prosecuting attorney immediately challenged defendant's testimony in reference to the matter of

dress. Almost the first question he asked defendant was: "When you came home that day you didn't have these boots on at all, did you (indicating)?" Defendant answered: "Oh yes I did." The testimony continued as follows: "Q. Oh no you didn't, did you? A. I certainly did. Q. As a matter of fact you had on another pair of boots that were old and rusty looking, laced clear up to the top of the boots, which almost reached your knees, didn't you? A. No, I did not. Q. When you came home you changed from the old rusty looking boots to these here (indicating), didn't you? A. No, I did not. Q. You are quite sure about that? A. I am positive." A few questions on another subject were then asked and then the prosecuting attorney renewed his interrogation concerning the boots, asking: "Q. Now, you are quite certain you didn't have on when you came home from work that afternoon, an old rusty looking pair of boots?" There then followed the occurrence quoted in the majority opinion culminating in the statement that the wife had told the district attorney that when defendant came home from work he had an old pair of rusty boots on that laced up the front. Immediately thereafter the trial judge interrogated the defendant at length about how he was dressed, sarcastically referring to defendant's testimony as to how he was dressed and as to what he was doing at that time of night in the park.

A reading of the record demonstrates that what the prosecutor was attempting to show was that defendant had come home from work and changed his clothes for the express purpose of going out and committing some crime. The defendant was vigorously contending that the costume he was wearing when arrested was the same costume worn by him that day at work, and the same type of costume worn by all tree toppers. That was an important issue, because, if defendant's testimony as to how he was dressed was believed, it supported the balance of his story as to what he was doing that night. If he did come home and change his clothes, and if the costume he was wearing when arrested was not his regular work costume, then great weight was given to the prosecution theory that defendant had deliberately started out to rob "petting parties." The prosecution was unable to prove that defendant had changed his clothes after coming home from work. Under such circumstances, for the prosecuting attorney to "testify" that defendant's wife had told

him defendant had changed his clothes, was to attack, improperly, the whole basis of defendant's defense. It is no answer to say, as does the majority opinion, that the defendant's counsel invited the error. While defendant's counsel demanded to know the nature of the paper the prosecutor was using in his cross-examination, that query was completely answered by the prosecutor's reply that it was a statement of defendant's wife. But for the prosecutor to then add what that statement purportedly contained, was clearly error of a most serious nature.

There is still another reason why the admitted error was prejudicial. The jury was called upon to determine whether the prosecutrix and her supporting witnesses were telling the truth, or whether defendant was telling the truth. The prosecutrix and her escort had told a story about riding out to the park late at night with another couple, and getting out of the car with a blanket and sitting down in the bushes to talk. That portion of their story is characterized as "inherently improbable" by appellant. It can at least be said that it is a reasonable argument to make that this portion of their story was open to doubt. The whole case turned upon the credibility of the respective witnesses. If defendant's story was believed, he was innocent. He was the only witness in his own behalf. For the prosecutor to tell the jury that, according to defendant's own wife, defendant was lying about how he was dressed, was to attack defendant's credibility in a most improper fashion. The obvious reaction would be that if defendant was lying as to that fact, his whole story was false. That was error of a most prejudicial character.

After reading the record I cannot say that the jury would have reached the same conclusions it did had the error not been committed. For that reason article VI, section 4½ of the Constitution cannot operate to cure the error. It may be that defendant is guilty. If so, he has committed several crimes of a particularly abhorrent character. But the fact that the prosecuting attorney may have honestly believed defendant guilty, does not excuse the means adopted by him to secure a conviction. The doctrine that the end justifies the means has no application to the trial of one accused of crime. As important as it is to society to see that those guilty of criminal activity should be punished, it is far more important to society as a whole that the fundamental prin-

ciple that every defendant is entitled to a fair trial should be preserved. The law prescribes the methods to be used in a criminal case. If defendant is guilty, should this case be reversed and remanded for a new trial, then no doubt the prosecution can prove that fact in a proper manner. If it cannot secure a conviction without resort to illegal means, then defendant should not be convicted.

Appellant's petition for a hearing by the Supreme Court was denied July 24, 1942. Traynor, J., voted for a hearing.