Filed 8/5/21  P. v. Soto CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PEDRO RODRIGUEZ SOTO,<br><br>Defendant and Appellant. | F079046<br><br>(Super. Ct. No. BF170449A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Pedro Rodriguez Soto contends on appeal that (1) the evidence presented at trial was insufficient to support his conviction for making criminal threats; (2) the trial court failed to instruct the jury sua sponte on the lesser included offense of attempted criminal threats; and (3) defendant's one-year prior prison term enhancement should be stricken in light of Senate Bill No. 136 (2019-2020 Reg. Sess.). We strike the prior prison term enhancement and affirm in all other respects.

## PROCEDURAL SUMMARY

By information filed April 2, 2018, the Kern County District Attorney charged defendant with first degree burglary (Pen. Code, § 460, subd. (a);[1] count 1) and criminal threats (§ 422; count 2). The information further alleged as to count 1 that the dwelling was inhabited at the time of the offense (§ 667.5, subd. (c)(21)) and alleged as to both counts that defendant had served four prior prison terms (§ 667.5, former subd. (b)).

On October 24, 2018, the jury found defendant guilty on count 2 (§ 422). As to count 1, the jury was unable to reach a verdict, and the court declared a mistrial. In a bifurcated proceeding, the trial court found one prior prison term allegation true.

On March 21, 2019, the trial court sentenced defendant to four years in state prison, consisting of the upper term of three years on count 2, plus a one-year prior prison term enhancement.

On March 28, 2019, defendant filed a notice of appeal.

## FACTS

On the night of November 19, 2017, Jorge and his wife, Janessa, were at home, asleep in their bed.[2] Their one-year-old child was also asleep in their room. Their two other children, six and seven years old, were asleep in a room located about five feet from

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

the front door of the home. Janessa's sister, Jennifer, and her boyfriend, Justin, were asleep in a third bedroom.

At approximately 2:30 a.m., Janessa heard someone at the front door and woke Jorge. Jorge went to the front door. Janessa went to Jennifer and Justin's room to wake them.

Jennifer testified that Janessa was crying and saying that someone was trying to get in and that help was needed. Jennifer was terrified. She ran to Janessa's room. There was a camera at the front door that points to the exterior of the door and it connected to a small monitor located in Janessa's room. As Jennifer watched and listened to what was going on at the front door from that monitor, she called 911.

Jennifer saw a man, later identified as defendant, asking for someone named Abel. When Jorge told defendant there was no one with that name at the address and that he had the wrong house, defendant got aggressive and said he was coming in. When Jorge told defendant he was not coming in, defendant said, "Yes, I am." Jennifer heard defendant state that he was going to shoot everyone in the house. She saw defendant reach in his waistband. She demonstrated what she saw by making "her hand into a gun formation and [then] point[ing] it towards her waistband and [then] pull[ing] it back up." Jennifer saw an object in defendant's hand which she believed was a gun. She saw defendant grab a broom that was by the door and use it to try to break the window that was next to the door. The screen at the front door "busted open" right above the doorknob. Defendant then tried to reach in to unlock the door. She heard defendant say that he was "going to come in," was "going to kill everybody," and was "going to shoot everybody in the house." Defendant motioned with his hands to Justin and Jorge to come out and fight him. Jennifer then heard the police helicopter, the police car engines, and the sirens and told the dispatcher the police had arrived. The 911 call ended and Jennifer went to the front door where the police were. Jennifer described the incident as a "very traumatic event" during which she was "super shaky, super anxious," "scared," and

3.

"fear[ed] for [her] life . . . because [they were] being threatened." Jennifer learned, when the police came, that the object she thought was a gun was the bottom part of the broom.

Jorge testified that, when he got to the front door, defendant was pulling hard on the exterior locked metal security screen door, trying to open it. Jorge opened the interior front door. Defendant "stepped back a little bit" and let go of the screen door. Jorge asked if he could help defendant. Defendant said, "Let me in." Jorge had never seen defendant before. Jorge told defendant that he had the wrong house. Defendant insisted it was the right house and raised his voice. Justin joined Jorge at the front door. Jorge asked defendant four to five times to leave his property. Because Jorge was not letting defendant in, defendant became "more mad" and, when asked to leave, defendant became more aggressive. Defendant stated the house belonged to his brother. When denied access to the house, defendant became "irate." Defendant started kicking the bottom of the door under the door handle. He kicked "[m]aybe, like, five times" stating he was going to come in. Jorge was "a little nervous" and was afraid defendant would hurt the people in the house. There was an aluminum broom outside the house. Defendant picked up the broom, "snapped it in half," and used it to jam and pry the metal screen above the deadbolt lock succeeding in prying the screen door open. Defendant cussed, hollered, kicked the door, and "was just mad." Defendant put his hand inside the broken screen and "fixated on opening" the inside deadbolt lock. Justin handed a machete to Jorge. When defendant reached in, Jorge told him he would cut his hand off. Defendant continued to stick his hand inside the house. After warning defendant five times, Jorge used the "nonsharp edge" of the knife to strike defendant's hand. Defendant removed his hand, then tried to "waist" the end of the broom like he had a gun stating he was going to shoot them. Defendant realized he had a cut on his hand and started kicking the door again. Defendant said he was going to shoot them or come back and shoot them. Jorge did not see a firearm. Defendant then gestured to Jorge and Justin to come outside to fight. Neither Jorge nor Justin exited the home. They did try to keep defendant at the

4.

door because defendant said he was coming back and because they could hear the police coming and they wanted "[t]o make sure [defendant] got caught." They did not tell defendant not to leave. When defendant saw the police, he ran. Jorge did not exit his home until after the police arrived because it was not safe.

Joseph Armijo, a City of Bakersfield police officer, testified. He stated that he was dispatched at 2:35 a.m. on November 19, 2017, to Jorge's home. He was with Officer Hernandez. The Kern County Sheriff's Office helicopter also responded. When Armijo and Hernandez arrived, Armijo saw defendant running "at a full sprint" northbound away from Jorge's home. Armijo pulled up in the patrol vehicle, activated the overhead emergency lights, exited the vehicle and directed defendant to stop. Defendant immediately stopped and got down to his knees. Armijo placed defendant in handcuffs, escorted him to the patrol car, and ultimately booked him into the jail. Defendant did not have a firearm and no firearm was located in the surrounding area. Defendant was bleeding "from both of his hands" and had injuries to the fingernail area of both hands. Defendant also had dried blood coming from his left nostril and his nose appeared to be swollen.

Armijo interviewed Jorge within 10 minutes of receiving the initial call. Jorge told him that defendant said, "I'm going to gun you down," and "I'll gun them down."[3] Jorge told him that he believed the threat to be credible. Jorge also believed defendant had a firearm in his waistband, but never actually described one. Jorge appeared to be afraid for his safety and concerned for the safety of his family.

All three witnesses − Jennifer, Jorge, and Armijo − testified to defendant's intoxication. When asked whether she told the dispatcher the man was under the influence, Jennifer responded, "Yes. Yes, big time." Jorge described defendant as

---

**3**     Armijo clarified that the first threat was a direct quote from Jorge, while the second was not, because Jorge did not repeat defendant's second statement verbatim.

"drunk." He told Armijo that defendant was slurring his speech and had belligerent behavior. Armijo said defendant displayed objective symptoms of being under the influence of an alcoholic substance including red, watery eyes, thick, slurred speech, and a strong odor of an alcoholic beverage emitting from his breath. Armijo said that, although defendant did not seem confused, he did have difficulty keeping his balance and was unsteady on his feet. Armijo booked defendant into the Kern County jail for attempted burglary, criminal threats, and public intoxication.

## DISCUSSION

## I.  SUFFICIENCY OF EVIDENCE

Defendant contends the prosecution failed to prove his threats caused the victim, Jorge, to be in "sustained fear." The People argue defendant's threats caused Jorge sustained fear, for himself and his family. We agree with the People.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 553.) We must draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640.) "It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1181.) We look for substantial evidence, and we may not reverse a conviction for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Although we review the whole record, "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible

6.

or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296; see *People v. Panah* (2005) 35 Cal.4th 395, 489.) Furthermore, " ' " '[c]ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " ' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid.*; *Panah*, at p. 488.)

Section 422 defines the offense of criminal threats as follows:

> "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . [was] to be taken as a threat, even if there [was] no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her

immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

" 'Sustained fear' refers to a state of mind." (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349.) Under section 422, subdivision (a), for fear to be "sustained," it must last for "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; see CALJIC No. 9.94; CALCRIM No. 1300.) "The word fear, of course, describes the emotion the victim experiences." (*Fierro*, at p. 1349.) In *Fierro*, the court concluded there was substantial evidence the victim felt "sustained fear" when he heard someone say, " 'I will kill you . . . right now,' " coupled with seeing a weapon. (*Ibid.*) Additionally, the *Fierro* court found that even a single minute of fear, during which the victim heard the threat and saw the weapon, qualified as "sustained" under the statute. (*Ibid.*) "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Ibid.*) The *Fierro* court differentiated these circumstances from those in *In re Ricky T.* (2001) 87 Cal.App.4th 1132, where "a student threatened to 'get' a teacher, but made no physical movements or gestures. The teacher responded by sending the student to the school office; the teacher did not call the police until the next day; and there had been no prior history between the defendant and the victim. [Citation.] The court found the teacher's fear to be fleeting." (*Fierro*, at p. 1349.)

Defendant points to Jorge's testimony that he did not believe defendant had a firearm and had not seen one. He argues that because Jorge knew defendant was not armed and because Jorge tried to keep defendant at the door, Jorge was not afraid that defendant would carry out his threats.

Ample evidence supported the jury's finding that defendant's threats caused Jorge reasonably to be in sustained fear for his and his family's safety. Jorge testified that defendant, a stranger to him, was at the door of his home in the middle of the night aggressively trying to enter his house and threatening to shoot him and his family.

Jennifer also heard these threats as evidenced by the content of her 911 call that was played for the jury. Both Jennifer, in her 911 call and in her testimony, and Jorge, in his testimony, stated defendant made hand motions indicating a gun in his waistband. Jorge testified that no one exited the residence until after the police arrived because it was not safe to do so. Armijo testified that Jorge told him immediately after the incident that he was afraid for himself and his family because he believed defendant's threats were credible. Minutes passed between defendant's threats and his apprehension by police, long enough for any fear suffered by Jorge to be "sustained."

Defendant's argument that Jorge's testimony was inconsistent with Armijo's testimony merely raises a question of credibility. " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) The only exception to this principle is where the testimony is "physically impossible or inherently improbable." (*People v. Young*, *supra*, 34 Cal.4th at p. 1181; see *People v. Headlee* (1941) 18 Cal.2d 266, 267 ["[w]here . . . the evidence relied upon by the prosecution is so improbable as to be incredible, and amounts to no evidence, a question of law is presented which authorizes an appellate court to set aside a conviction"].) That exception does not apply here. Jorge's testimony was based on his recollection of the events. Armijo's testimony, on the other hand, was based not only on his recollection of the events, but on what Jorge told him immediately after the incident when he prepared his police report. Neither witness's testimony was physically impossible or inherently improbable.

Defendant claims the prosecutor "conceded that [Jorge] had 'said that he wasn't scared.' " The prosecutor did address Jorge's testimony during argument, but the

obvious purpose of this argument was not to concede the fear issue, but to explain the change in Jorge's story. She argued that, even if Jorge was terrified at the time of the incident, he tried to minimize his fear at trial in light of the later discovery that defendant was not armed with a gun. The prosecutor stressed that other evidence, including Jorge's behavior and his contemporaneous statements to Armijo, demonstrated Jorge was in fact fearful that night. In response, defense counsel argued that Jorge testified he was "not really scared," although he did have some concerns that defendant would get in. Jorge, however, never testified he was not scared. Argument of counsel is not evidence. (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173.)

Ultimately, the jury chose to credit the evidence that Jorge reasonably feared defendant was going to harm him or his family, and remained in sustained fear until the police arrived and apprehended defendant. Substantial evidence supported their verdict.

## II. LESSER INCLUDED OFFENSE

Defendant contends that, since there was evidence that Jorge did not experience sustained fear, the trial court erred in failing to instruct on the lesser included offense of attempted criminal threats. The People argue there was overwhelming evidence that Jorge was in sustained fear for his family, if not himself, and thus the lesser offense had no substantial evidence to support an instruction.

A defendant can commit the lesser offense of attempted criminal threat if he, "acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or [his family's] safety even though, under the circumstances, that person reasonably could have been placed in such fear . . . . In [this] situation[], only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*People v. Toledo*, *supra*, 26 Cal.4th at p. 231.)

10.

When substantial evidence supports a lesser included offense, the trial court must instruct on it sua sponte. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*), abrogated on another ground by amendment of § 189.) The existence of "*any* evidence . . . , no matter how weak," however, will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12; see *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127; *People v. Ramos* (1982) 30 Cal.3d 553, 582.) "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. (*Flannel*, at p. 684.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, at p. 177.) The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on its own initiative. (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

In a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories that are supported by the evidence must be reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*Breverman*, *supra*, 19 Cal.4th at p. 178.) A conviction of the charged offense may be reversed only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, at p. 836). "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. Accordingly, a determination that a duty arose

11.

to give instructions on a lesser included offense, and that the omission of such instructions in whole or in part was error, does not resolve the question whether the error was prejudicial. Application of the *Watson* standard of appellate review may disclose that, though error occurred, it was harmless." (*Breverman*, at pp. 177-178, fn. omitted.)

Even if the trial court should have instructed the jury on the lesser included offense of attempted criminal threats, the failure to do so was harmless because there is no reasonable probability defendant would have obtained a more favorable outcome had the court provided the instruction.

Defendant first argues the evidence that Jorge did not feel sustained fear was strong enough to make it likely the jury could have found defendant guilty of only the lesser included offense of attempted criminal threats, had they been given that instruction.

As relevant to this case, the only difference between criminal threats and attempted criminal threats is that criminal threats cause a victim sustained fear, while attempted criminal threats do not. Despite the conflict in testimony, the evidence that Jorge experienced sustained fear was strong. As detailed above, Jorge testified that defendant threatened to shoot him and his family. Defendant's threats were corroborated by Jennifer's recorded 911 call. During the 911 call and in her testimony, Jennifer stated that defendant had a gun and was making motions like he was going to shoot Jorge and Justin at the front door. Jennifer also testified the broom looked like a firearm and she did not realize until after defendant's arrest that it was a broken broom handle. Jorge was afraid enough that defendant would carry out his threats that he tried to keep defendant from leaving the premises until the police could apprehend him. Armijo testified that right after the incident when he recorded Jorge's statements in his police report, Jorge told him that he was afraid for himself and his family, and that he believed defendant had a firearm. Based on the relative strength of this evidence, compared to the far weaker inference that Jorge may not have been afraid, the jurors would likely have found

12.

defendant made criminal threats even if they had also been instructed on attempted criminal threats.

Second, defendant argues the jury's communications to the trial court during deliberation suggest that, had the jury received an instruction on attempted criminal threat, he would have "had a reasonable chance of achieving a better outcome on count 2."

During deliberations, the jury sent five separate "jury question/request for assistance" (capitalization omitted) communications to the trial court. Defendant cites to two of those communications submitted to the court on October 23, 2018. The first, submitted at 11:10 a.m., read: "In [t]he charge of criminal intent, do we consider the fear of others in the home? [O]r [j]ust Jorge . . . ?" The court and counsel discussed that question and agreed it was "definitely asking about Count 2." The trial court responded to this inquiry by directing the jury to "[r]efer to CALCRIM 1300." That instruction stated in relevant part: "To prove that the defendant is guilty of [Count 2], the People must prove that: [¶] 1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Jorge . . . ; [¶] . . . [¶] 5. The threat actually caused Jorge . . . to be in sustained fear for his own safety or for the safety of his immediate family; [¶] [and] [¶] 6. Jorge['s] . . . fear was reasonable under the circumstances."

The second jury communication cited to by defendant, submitted three hours later at 2:10 p.m., read: "We would like to hear the court reporter read back the portion of the testimony of Jorge . . . when [defendant] is trying to get in to the door. Where he states, 'I'm coming in[.']" Defendant argues this inquiry at 2:10 p.m. indicated the jurors continued to "harbor[] the doubts expressed in the first note to the court." It did not.

Defendant fails to acknowledge that, between the two communications he cites to, the jury submitted a communication to the court at 1:00 p.m., which read: "We are hung on count one; but have a verdict on count two. We have discussed it at length and . . . do

13.

not forsee [*sic*] a change on count one's hung status." The court responded to the 1:00 p.m. note by reading CALCRIM No. 3551 to the jury,[4] and directed them to "please continue deliberations at this time."

Thus, the 2:10 p.m. note had nothing to do with any doubt about whether Jorge experienced sustained fear for his own safety or for the safety of his immediate family. The jury had already reached a verdict on count 2. Their request in the 2:10 p.m. note only related to their attempts to reach a verdict on count 1.

Accordingly, the jury's communications to the court during their deliberations do not support defendant's theory that, had the court instructed on the lesser included offense of attempted criminal threats, defendant would have "had a reasonable chance of achieving a better outcome on count 2." The 11:10 a.m. communication merely asked about whose fear they were to be concerned with for count 2, and the 1:00 p.m. note indicated their unanimous decision on that issue.

Again, there is no reasonable probability defendant would have obtained a more favorable outcome had the court instructed the jury on the lesser included offense of attempted criminal threats.

## III. SENATE BILL NO. 136 (2019-2020 Reg. Sess.)

Senate Bill No. 136 (2019-2020 Reg. Sess.) amended section 667.5, subdivision (b) to limit prior prison term enhancements to only prior terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) Defendant's prior prison term, on which his sentence enhancement was based, was served for possession of a controlled substance in custody (§ 4573.6), not for a sexually violent offense, and thus it must be stricken. Because the

---

**4**      CALCRIM No. 3551 can be read to a deadlocked jury, urging jurors to continue deliberating. (Bench Note to CALCRIM No. 3551.)

trial court sentenced defendant to the maximum term on his single count of conviction, there is no need for the court to again exercise its sentencing discretion. (*People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.) Accordingly, we strike the one section 667.5, former subdivision (b), enhancement imposed in this matter.

## DISPOSITION

The one-year prior prison term enhancement (§ 667.5, former subd. (b)) is stricken. The trial court is directed to prepare an amended abstract of judgment and forward copies to the appropriate entities. In all other respects, the judgment is affirmed.

DETJEN, Acting P.J.

WE CONCUR:

SMITH, J.

MEEHAN, J.

15.