Filed 10/12/21 P. v. Valdez CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN MEJIA VALDEZ,<br><br>    Defendant and Appellant. | E073931<br><br>(Super.Ct.No. RIF1802079)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Juan Mejia Valdez appeals from his conviction of aggravated sexual assault and oral copulation of a minor, Jane Doe (Jane), and from his prison sentence of 15 years to life plus six years. He argues: (1) the People did not establish the element of "sexual penetration" for rape, for purposes of his conviction for aggravated sexual assault; and (2) the trial court erred by instructing the jury that, if it found defendant guilty of oral copulation, it could conclude from that evidence that he had the propensity to commit the separate charge of aggravated sexual assault. We find no error and affirm the judgment.

I.

PROCEDURAL BACKGROUND

In a first amended information, the People charged defendant with one count of aggravated sexual assault of a minor under 14 years of age by commission of a rape (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(2), (a)(6), count 1);[1] one count of aggravated sexual assault of a minor under 14 years of age by commission of sexual penetration (§§ 269, subd. (a)(3), 286, subds. (c)(2), (c)(3), (d), count 2); and one count of oral copulation of a minor under 14 years of age (§ 287, subd. (c)(1), count 3).

During the trial, the trial court granted the People's request to dismiss count 2 in the interest of justice. (§ 1385.) A jury found defendant guilty on the remaining counts, and the trial court sentenced him to state prison for 15 years to life on count 1 and to the midterm of six years on count 3, to be served consecutively. Defendant timely appealed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

II.

FACTS

Jane was 14 years old during the trial.[2]  She testified that she lived in a house with her mother, her twin brothers, her aunt and uncle (her mother's brother), and her three cousins, including her cousin M.[3]  Sometime later, defendant also moved into the home. Jane referred to defendant as "uncle," but he was actually Jane's mother's cousin.

Defendant would drive Jane's mother to doctor's appointments and other places, and he started to spend time with Jane and M.  He bought them food and sometimes let Jane use his phone to play games or to text message her cousins.  When defendant would not give her his phone, Jane would "play around" and try to take the phone away from him.  If she managed to get the phone, he would wrestle and tickle her.  While wrestling, defendant inappropriately touched Jane's breasts.

Once, when everyone was gone from the home except for defendant, Jane, and M., Jane asked to use defendant's phone.  Defendant told her that "in order to use his phone," she had to "pleasure him."  Jane said, "No," and defendant went to his room.  Later, while Jane and M. were watching television in another room, defendant called out for Jane. When Jane went to defendant's room, he grabbed Jane by the arm, pulled her into the

---

[2]  Jane was unsure whether she was 12 or 13 years old when the events she described took place.

[3]  M. was eight years old at the time the events took place and 10 years old during the trial.

room, closed the door, and touched her breasts (over her clothing).  Jane was able to push defendant away, leave his room, and tell M. what happened.

On a different day, when Jane was alone with defendant and M., defendant again pulled Jane into his room.  He pushed her onto the bed, removed her bra, touched her breasts, and pulled her panties down.  Jane yelled for M., who was in the living room, to find a phone and call her mother or the police for help, but defendant put his hand over Jane's mouth to quiet her.  Jane testified, "[H]e started licking my boobs," "tried to put his penis again inside my vagina, and I tried to stop him."  Defendant also put his mouth on her vagina.  When asked, "Did you feel his penis in your body?" Jane answered, "Yes." And, when the prosecutor asked more specifically, "[W]here did you feel his penis on your body?" she said, "[H]e was trying to put it in."  Jane tried to stop him, but he was on top of her.  Defendant finally stopped when family members came home.  Jane pulled up her pants and ran out of the room.  Jane did not tell any adults what happened because she was afraid nobody would believe her.  She did, however, tell another cousin and two friends what had happened.  One of the friends told Jane to stay away from defendant.

Another incident occurred when Jane was taking a shower and defendant started touching her.  Jane testified that defendant pulled down his pants and was "trying to put his penis inside [her] vagina," but she "didn't let him."  She pushed him away, turned off the water, and got out of the shower.  When asked, "Did you feel his penis towards your vagina?  Did he ever touch it?" Jane answered, "Yes."  Defendant stopped when he heard a door open or close.  Jane did not yell for anyone because she was scared.

4

Finally, Jane testified defendant tried to make her sit on his lap so he could show her pornography on his phone, and he told her she "should be like that." And, he once tried to put his penis in her mouth and told her to touch it. Jane said, "No," and walked away.

On cross-examination, defense counsel asked Jane, "[Y]ou didn't actually feel him put his penis in your vagina; isn't that right?" Jane answered, "I felt it, but I didn't know if it went in or not." Jane testified she did not see his penis go inside her vagina. And, when asked again, "Did you feel it go in?" she said, "I felt it, but I don't know if it went in." On redirect, Jane testified she had never had a sexual experience before, and she had very little knowledge about sex.

M. testified she saw defendant grab Jane by the arm and pull her into his room. The door to defendant's room was not completely shut, and she saw defendant pull his pants down, pull Jane's pants down, and Jane trying to get free from defendant. M. tried to pull Jane away from defendant, but defendant told her to "get out."

One of Jane's friends testified that when they were in the seventh grade, Jane sent the following text to her: "[H]elp, my uncle's trying to rape me." The friend told Jane to "get out of the house." The friend did not tell anyone what Jane had told her because she was scared. The next time the two saw each other, the friend asked Jane if she was serious about what had happened, and she asked Jane if she was okay. Jane said she was serious, and she was not okay. The friend also asked if Jane had told "an adult or her mom," and Jane said she had.

Jane's mother testified that Jane and M. started to say defendant "is bad." When she asked why, the girls merely replied, "because he is bad." Sometime later, however, Jane's brother asked his mother, "[D]o you see what your daughter is doing?" He said Jane was making "ugly" comments "about [his] uncle." Jane's brother said he had read a message Jane sent to "one of her friends" accusing her uncle of trying to "rape" her. Jane's mother got angry with Jane, told her she "did not want any stories," and said Jane needed to respect her uncle. At first, Jane's mother and brother thought Jane had accused her mother's brother of abusing her, but they soon learned it was defendant Jane was texting the "rape" message about. Jane's mother later learned that Jane had told a school counselor about defendant's abuse.

A school counselor testified that one of Jane's teachers advised her that Jane had been cutting herself with a safety pin and said she wished she was dead. During a meeting between the counselor and Jane, she eventually told the counselor that an older male in her home "had forced her to have sex with him three times" and made "her watch pornography and do other things." The counselor called child protective services and the police.

A sheriff's deputy responded to the school and spoke to Jane. Jane told the deputy that defendant "pinned her down and forced himself on her." She told the deputy defendant had sex with her "[t]hree or more" times and showed her pornography. She described the incident during which defendant pulled her into the room, and he forced himself on her while M. tried to pull her away from him. Jane told the deputy that "she knew what sex meant," and said defendant "put his penis in her butt," "in her vagina,"

6

and "in her mouth." The deputy did not recall, however, whether he "specif[ied] with her what actual penetration meant versus just sexual acts."

At the sheriff's station, Jane told an investigator that defendant called for her to go to his room, started "touching her all over her body, and trying to take her clothes off." Jane said defendant pulled her pants down to her knees, pulled his pants down, "then attempt[ed] to insert his penis." The investigator did not ask Jane "whether or not she understood that what we commonly refer to as sex includes penetration" or "whether or not to [her] touching a vagina meant sex."

The following day, Jane was taken to be forensically interviewed by a social worker. A video of the interview was played for the jury. During the interview, Jane said that, when defendant pulled her into his room, he pulled down her pants and underwear, pulled down his own pants, "and start[ed] . . . putting his . . . private part into my private part." When asked "[W]hat part of your private was it going into?" Jane indicated, "This part." But when the social worker asked Jane to be more specific ("there's the top, there's the middle and there's the hole"), Jane said, "I don't remember," and "I didn't feel nothing 'cause I—I didn't know if he . . . actually put it in or not." She felt his "private" part on her "a little" and said defendant moved back and forth for about two minutes while he was on top of her. Later in the interview, the social worker asked Jane if she knew what "sex" and "rape" meant. Jane said, "touching my private parts," "putting their private parts into my body and all that stuff," and "when you're forced to . . . have sex" and "you don't want to."

7

A psychologist testified generally about child sexual abuse accommodation syndrome, which helps to explain why victims of child sexual abuse might hesitate to immediately disclose their abuse.

A video of an interview of defendant with sheriff's investigators was played for the jury. Defendant said Jane "always wanted my phone," and she would throw things at him if he did not give it to her. Defendant said that once, when he was on the sofa in the living room, Jane told him she was going to pull down his pants. He told her, "No," but she pulled his sweatpants and underwear down to his knees. Defendant asked why she had done that, and Jane said she wanted to see his penis. Jane grabbed defendant's penis, it made him feel "bad," and he told her to stop. Defendant said he did not get an erection because he has a medical condition, and he has not had an erection in many years.

On another occasion, when he was naked and getting ready to bathe himself, Jane entered the bathroom and said she wanted to wash him. He told her, "No," but she stayed in the bathroom while he bathed himself.

Defendant told investigators that on a different occasion, Jane called for defendant to go to her room. When he entered the room, Jane took her clothing off and said, "come and look what I have." Jane told defendant to pull down his pants. He said, "I can't," but she pulled them down and told him to touch her. Defendant admitted that he touched Jane's vagina. Jane was on the floor and pulled defendant down on top of her. Defendant said his penis was not erect. Jane grabbed his penis and "tried putting it inside her." When asked, "Did your penis go inside her vagina?" defendant said, "just a little bit." Jane then said, "Get off already," and defendant got up and left her room.

8

On yet another occasion, Jane took defendant's phone with her into the shower. When defendant entered the bathroom to take the phone from Jane, she told him to join her in the shower and touch her. Defendant got into the shower with Jane and touched her vagina with his hand. Jane said she wanted defendant to put his penis in her vagina. She got close to him and touched his penis with her hand. When asked if his penis went inside Jane's vagina, he said, "A little bit, because . . . it's really weak." He also said that Jane grabbed his penis and put it in her mouth. Finally, defendant admitted that on one occasion he licked Jane's vagina.

## III.

## DISCUSSION

A.      *The Record Contains Substantial Evidence of Penetration.*

According to defendant, the prosecutor did not introduce substantial evidence that defendant penetrated Jane's vagina or genitalia with his penis, a necessary element for the offense of rape. Instead, he argues the evidence establishes, at most, that defendant tried but failed to penetrate her. We are not persuaded.

"'In determining evidentiary sufficiency, the court reviews the entire record, in the light most favorable to the judgment, for the presence of substantial evidence. Substantial evidence is evidence sufficiently reasonable, credible, and of such solid value "that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1273, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the

9

determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)

"'[O]ur task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""'be reasonably reconciled with the defendant's innocence.""'" (*People v. Veamatahau* (2020) 9 Cal.5th 16, 36.) Instead, "'[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Defendant's conviction on count 1 for aggravated sexual assault of a minor required the jury to find beyond a reasonable doubt that defendant raped Jane. (§§ 269, subd. (a)(1), 261, subd. (a)(2), (a)(6).) Rape is an unlawful "act of sexual intercourse." (§ 261, subd. (a).) "The essential guilt of rape consists in the outrage to the person and feelings of the victim of rape. Any sexual penetration, however slight, is sufficient to complete the crime." (§ 263.) Ejaculation is not an element of the offense. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1079.)

The Penal Code does not define "sexual penetration." Our Supreme Court has held "'sexual intercourse' has a common meaning in the context of rape" and, when

instructing a jury, a trial court need not provide "technical elaboration" about its meaning because "the term can only refer to vaginal penetration or intercourse." (*People v. Stitely* (2005) 35 Cal.4th 514, 554.) However, the court has never squarely held that the offense of rape requires penetration of the vagina "as it is commonly understood." (*People v. Paz* (2017) 10 Cal.App.5th 1023, 1037 (*Paz*).)

"[A]ppellate courts have long held that vaginal penetration does *not* require penetration of the vagina. (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232 . . . (*Karsai*).)[4] Rather, '[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina.' (*Ibid.* [victim's testimony that defendant pushed his penis between the 'lips' of her vagina was sufficient to support rape conviction]; see also *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 . . . [relying on *Karsai*, sexual intercourse required proof of 'penetration of [the victim's] labia majora, not her vagina'].) In short, although the term *vagina* has a well-established anatomical meaning, California courts have long treated it as a term of art synonymous with 'female private parts.' (See, e.g., *People v. Coleman* (1942) 53 Cal.App.2d 18, 26 . . . [sufficient evidence defendant used his 'private parts' to penetrate victim's 'private parts'].)" (*Paz*,

---

**4** The California Supreme Court disapproved of *People v. Karsai* (1982) 131 Cal.App.3d 224 on another ground in *People v. Jones* (1988) 46 Cal.3d 585, 600, footnote 8, but that decision remains one of the leading cases on the meaning of "sexual penetration." (*Paz*, *supra*, 10 Cal.App.5th at p. 1037, fn. 12; see bench notes to CALCRIM No. 1000 (2021 ed.) p. 722 [citing *Karsai* for meaning of penetration in standard rape instruction]; see also *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366, 1371 [relying on *Karsai* for meaning of "sexual penetration" of a minor with a foreign object in violation of § 289].)

*supra*, 10 Cal.App.5th at p. 1037; see *ibid*. ["[C]ourts are inclined to take a broad view of genital boundaries."].)  CALCRIM No. 1000, the standard rape instruction given to the jury in this case, reflects that caselaw:  "*Sexual intercourse* means any penetration, no matter how slight, of the vagina *or genitalia* by the penis."  (First italics in original, second italics added.)

Jane testified that, when defendant pulled her into his room, "he *tried* to put his penis again inside [her] vagina," but also testified that she felt "his penis *in* [her] body." (Italics added.)  Likewise, Jane testified that, when defendant got into the shower with her, he was "*trying* to put his penis inside [her] vagina."  (Italics added.)  She testified she felt his penis "towards [her] vagina" and said he touched her vagina with his penis.  On cross-examination, Jane testified she felt defendant's penis but was not sure "if it went in or not."

Jane's trial testimony was consistent with:  (1) her videotaped interview, during which she told the social worker that defendant "start[ed] . . . putting his . . . private part *into* my private part," but she was somewhat unsure "if he . . . actually put it in or not" (italics added); (2) her statements to the police that defendant put his penis "*in* her vagina" and "attempt[ed] to insert his penis" into her vagina (italics added); and (3) defendant's videotaped statement, during which he admitted that on two occasions he tried to put his penis inside Jane's vagina but only succeeded in putting it in "a little bit."

12

From the evidence, and the reasonable inferences to be drawn from it, a jury could conclude beyond a reasonable doubt that defendant did, in fact, penetrate Jane's sexual genitalia but not her vagina. Jane, who had no prior sexual experience and limited knowledge about sex, admitted she was unsure if defendant's penis *entered* her vagina, but she consistently said she felt it inside her, which is consistent with penetration of the outer genitalia. In short, the evidence amply satisfied the broad definition given to "sexual penetration" by the cases.

Defendant faults the prosecutor for not eliciting more specific testimony from Jane about exactly where in or on her body she felt his penis, and that the evidence recounted *ante* was not specific enough to prove "sexual penetration" of the female sex organs. As the court noted in *Paz*, "In all sex-crime cases requiring penetration, prosecutors must elicit precise and specific testimony to prove the required penetration beyond a reasonable doubt." (*Paz*, *supra*, 10 Cal.App.5th at p. 1038.) The court also warned prosecutors to avoid "vague, euphemistic language and to ask followup questions where necessary." (*Ibid*.) While we agree with those observations, the prosecutor in this case was not vague when questioning Jane and did not use euphemisms. More importantly, Jane's testimony and the uncontradicted evidence of her statements to police and a social worker—in addition to defendant's own statements to police that he put his penis inside Jane's vagina "a little bit"—established the element of "sexual penetration."

13

B.      *No Instructional Error.*

Defendant contends the trial court erred by instructing the jury with a modified CALCRIM No. 1191B.[5] The jury was told that, if it found beyond a reasonable doubt that defendant orally copulated Jane as alleged in count 3, it could (but was not required to) consider that evidence as one factor when deciding whether he committed the offense of aggravated sexual assault of a minor against Jane as alleged in count 1.[6] According to defendant, Evidence Code section 1108 only permits the use of evidence of charged sexual offenses against one victim to establish a defendant's propensity to commit charged sexual offenses against *a different* victim. In addition, to the extent binding caselaw from the California Supreme Court supports giving the instruction under the

---

[5] Defendant concedes he did not object to the instruction. Anticipating we would find his claim of instructional error to be forfeited, defendant argues his trial attorney rendered ineffective assistance of counsel by not objecting. Because the alleged instructional error potentially affects defendant's substantial rights, we reach the merits regardless of any forfeiture. (§ 1259; *People v. Lewis* (2009) 46 Cal.4th 1255, 1294, fn. 28.)

[6] The trial court instructed the jury with CALCRIM No. 1191B as follows: "The People presented evidence that the defendant committed the crime of oral copulation of a person who is under the age of 14 and at least ten years younger than the defendant as charged in Count 3. If the People have proved beyond a reasonable doubt that the defendant committed this crime, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sexual offense changed—the other sex offense charged in this case.
"If you find the defendant committed this crime, this conclusion only is one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove the charge beyond a reasonable doubt."

14

circumstances presented in this case, defendant contends the instruction violated his due process rights under the federal constitution. We find no error.

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Subject to certain statutory exceptions, "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Relevant here, Evidence Code section 1108 provides that character evidence, in the form of "evidence of the defendant's commission of another sexual offense or offenses," *is admissible* in a prosecution for a sexual offense if the evidence is not made inadmissible by Evidence Code section 352. (§ 1108, subd. (a).) Section 352, in turn, provides that otherwise relevant evidence is not admissible if its probative value is substantially outweighed by its prejudicial impact, its admission will unduly consume time, it will confuse the issues, or it will mislead the jury. (§ 352.)

Traditionally, Evidence Code section 1108 had been used to introduce evidence of prior *uncharged* sexual offenses to establish a defendant's propensity to commit a charged sexual offense. In *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), the defendant was charged with and convicted of multiple sexual offenses against five women. (*Id.* at pp. 1156-1158.) The trial court instructed the jury with a modified

CALCRIM former No. 1191[7] that it could "use evidence of defendant's guilt of one of the charged sexual offenses as evidence of his propensity to commit the other charged sexual offenses." (*Villatoro*, at p. 1158.) On appeal, the defendant argued the instruction was erroneous because section 1108 only permits admission of and consideration of *uncharged* sexual offenses as propensity evidence. (*Villatoro*, at p. 1159.)

In *Villatoro*, the California Supreme Court rejected the defendant's argument. "By its terms, [Evidence Code section 1108, subdivision (a)] does not distinguish between charged or uncharged sexual offenses, and refers instead to '*another* sexual offense or offenses.' (Italics added.) As used here, the ordinary meaning of the word 'another' is 'being one more in addition to one or a number of the same kind: ADDITIONAL.' [Citations.] This definition of 'another' contains no limitation, temporal or otherwise, to suggest that section 1108 covers only offenses other than those for which the defendant is currently on trial." (*Villatoro*, *supra*, 54 Cal.4th at pp. 1160-1161.) In addition, the Supreme Court rejected the suggestion that, by limiting propensity evidence to evidence that is not made inadmissible by Evidence Code sections 352 and 1101, section 1108 must be interpreted to apply solely to uncharged sexual offenses. (*Villatoro*, at pp. 1161-1164.)

"[W]e conclude nothing in the language of [Evidence Code] section 1108 restricts its application to uncharged offenses. Indeed, the clear purpose of section 1108 is to

---

**7** In 2017, the Judicial Council revised CALCRIM No. 1191 and split it into two instructions to distinguish between uncharged offenses offered as propensity evidence (CALCRIM No. 1191A) and charged offenses offered for that purpose (CALCRIM No. 1191B). (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1 (*Gonzales*).)

permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses. 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' [Citations.] '[C]ase law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses.' [Citations.] In light of this clear purpose, we perceive no reason why the Legislature would exclude charged sexual offenses from section 1108's purview, and no indication that it did so in either the text of section 1108 or its legislative history. Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence. Indeed, section 1108's legislative history explains that '"admission *and consideration* of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible."'" (*Villatoro*, *supra*, 54 Cal.4th at p. 1164.)

Finally, the majority in *Villatoro* rejected the argument made in a concurring and dissenting opinion that the instruction given in that case amounted to "'bootstrapping of verdicts,'" which might have permitted the jury to draw an improper inference and resulted in an unfair trial in violation of the federal constitution. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1165-1167; see *id*. at pp. 1169-1182 (conc. & dis. opn. of Corrigan, J.).)

More recently, our colleagues in the Second Appellate District concluded that Evidence Code section 1108 does not restrict the use of uncharged sexual offenses as

17

propensity evidence to misconduct related to third persons. In *Gonzales*, *supra*, 16 Cal.App.5th 494, the defendant was charged with multiple sexual offenses against one victim. The victim also testified about uncharged sexual offenses the defendant committed against her. (*Id*. at pp. 497-498.) On appeal, the defendant argued the trial court erred by instructing the jury with CALCRIM former No. 1191 on the use of uncharged sexual offenses as propensity evidence because the instruction "improperly allowed [the victim] to corroborate her own testimony." (*Gonzales*, at p. 500.)

The appellate court disagreed. "It appears the gravamen of Gonzales's argument is that CALCRIM [former] No. 1191 should be given only where the evidence of uncharged sexual misconduct comes from third parties, and not from the victim-witness herself. Gonzales's theory is that although testimony about a defendant's uncharged sexual misconduct from a third party makes it more likely the victim's testimony is truthful, similar testimony from the victim herself adds nothing to her credibility. [¶] But the argument relates to the admissibility of the victim's evidence of uncharged misconduct, not the instruction. Gonzales does not challenge the trial court's ruling admitting the evidence for the purpose stated in CALCRIM [former] No. 1191. Given that the evidence is admissible for such purpose, CALCRIM [former] No. 1191 correctly instructs the jury." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 501.)

In addition, the court in *Gonzales* rejected the defendant's argument that permitting the victim to corroborate her own testimony was impermissible: "Nothing in [Evidence Code] section 1108 limits its effect to the testimony of third parties. Instead, the statute allows the admission of evidence of uncharged sexual offenses from any

witness subject to section 352. [Citation.] Here the trial court complied with the statute. CALCRIM [former] No. 1191 is an appropriate instruction." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 502.) Finally, the court rejected the assertion that the instruction allowed the jury to draw an irrational inference ("that testimony by the victim of uncharged sexual offenses corroborates the victim's testimony of the charged sexual offenses") and violated his right to due process. (*Ibid*.) "[T]here is nothing irrational about a victim supporting her testimony with testimony of uncharged sexual offenses. We agree, however, that such testimony is not as probative as similar testimony from a third party. But it is still probative. [Citations.] CALCRIM [former] No. 1191 does not violate due process."[8] (*Ibid*.)

Neither *Villatoro* nor *Gonzales* addressed the specific facts of this case—permitting a jury to consider evidence that defendant committed one charged sexual offense against Jane as propensity for him to commit another charged offense against that same victim. But, taken together, those decisions clearly support the instruction given in this case. As the Supreme Court noted in *Villatoro*, the pertinent language in Evidence Code section 1108, subdivision (a)—that evidence of "*another* sexual offense or offenses" is admissible—"contains no limitation, temporal or *otherwise* . . . ." (*Villatoro*, *supra*, 54 Cal.4th at p. 1161, first italics in original, second italics added.) The definition given to the word "another" by the court is broad enough to encompass charged sexual offenses

---

**8** The court held that, to the extent the instruction given in that case may have resulted in the jury misapplying the standard of proof for the *charged* offenses, the error was harmless. (*Gonzales*, *supra*, 16 Cal.App.5th at pp. 502-503.)

against a single victim.  (*Ibid.*)  And in *Gonzales*, the appellate court expressly held that "[n]othing in [Evidence Code] section 1108 limits its effect to the testimony of third parties."  (*Gonzales*, *supra*, 16 Cal.App.5th at p. 502.)  Although the facts of that case involved the use of uncharged sexual offenses against one victim to establish propensity to commit charged offenses against the same victim, the court's reasoning, that we adopt as our own, applies equally to the situation presented here.

Defendant seems to acknowledge that the majority decision in *Villatoro* effectively dooms his state law and federal due process claims of error, but he relies on the concurring and dissenting opinions in that case to argue the majority was wrong. Unlike the concurring and dissenting opinions in *Villatoro*, we are dutybound to follow the *majority* opinion in that case.  (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Having presented and preserved defendant's arguments here, he may petition the California Supreme Court for review and ask that court to reconsider *Villatoro* and, if appropriate, present his federal due process claims in an appropriate postconviction proceeding.  But, unless and until the high court changes course, we must follow the majority decision in *Villatoro*.  (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 67-68 [concluding the defendant's claim, that the trial court erred by instructing the jury with CALCRIM No. 1191B, was foreclosed by *Villatoro*].)

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

SLOUGH
J.

MENETREZ
J.

21